**Richard GABBARD, Appellant**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2008–SC–000062–MR.

Supreme Court of Kentucky.

Oct. 29, 2009.

Shannon Renee Dupree, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General, Gregory C. Fuchs, Assistant Attorney General, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice NOBLE.

Appellant Richard Gabbard was convicted of murdering his girlfriend by shooting her. On appeal, he claims that the trial court erred by failing to strike two jurors for cause, by not to allowing him to ask lay witnesses their opinion about whether the shooting was accidental, and by allowing evidence of prior threats he had made. Because this Court agrees that the trial court erred by not striking one of the jurors for cause, Appellant's conviction must be reversed.

## I. Background

Appellant lived with the victim, Michelle Davidson Krystofik, who had been his girlfriend for five years. Kelly and Kim, who were the victim's daughters, along with Kim's infant son, also lived with them.

Kelly testified that on the night of the shooting Appellant and the victim had been sitting in the living room. Appellant was cleaning his guns. Kelly was in her bedroom when she heard a gunshot. She went to the living room and saw that her mother had been shot. She testified that Appellant told her it had been an accident. She had heard no arguing between her mother and Appellant prior to the shooting.

Kim testified that earlier in the evening, Appellant had argued with her, her ex-boyfriend (via telephone), and the victim about an incident at a family gathering several weeks earlier during which Appellant had argued with the victim's father. She stated that her mother and Appellant appeared angry at each other. She claimed that Appellant then took a gun from the cabinet and walked outside. When he returned, according to Kim, the victim asked him why he needed a gun. He replied, "Because I might need to shoot somebody." Kim testified that she started to walk to her room when she heard the shot.

It was revealed at trial that Kim had given two interviews to police after the shooting in which she said it was an "ordinary" evening. In the interviews, she did not say that there had been any arguing or that Appellant said he "might need to shoot somebody," though she said Appellant may have been cleaning his gun when the shooting occurred.

Appellant admitted to police that he had "kinda" been arguing with the victim about the incident at her father's house several weeks before. He claimed that he had been cleaning his guns and that he took a gun when he went outside because a neigh-

bor had threatened him earlier. He told police that when he came back into the house, he may have been "goofing off" and raised the gun "like a fool," but claimed never to have pointed the gun at the victim. He admitted he may have pulled the trigger, though he did not think he did. One of the officers testified that Appellant had also stated that the gun went off while he was cleaning it.

Other testimony at trial came from competing expert witnesses (about what would have been necessary for the gun to accidentally fire), a medical examiner, an accident reconstructionist, and witnesses who testified about other incidents where Appellant had threatened or pointed a gun at people, including the victim. In addition to his expert witness, Appellant presented witnesses who testified that he and the victim appeared to be getting along prior to the shooting and did not argue.

The jury convicted Appellant of wanton murder. To avoid a penalty phase, Appellant and the prosecution agreed to a sentence of twenty years in prison. This appeal, then, is a matter of right. Ky. Const. § 110(2)(b).

## II.  Analysis

### A.  For–Cause Strikes

■ Appellant complains that two jurors should have been struck for cause and that he was forced to use peremptory challenges on them. He notes that if the jurors should have been struck for cause, the trial judge's failure to do so was reversible error under *Shane v. Commonwealth*, 243 S.W.3d 336 (Ky.2007).

The first juror stated that she knew the defendant's sister, had worked with her for at least the last ten years, and saw, worked with, and talked to her every day. When asked if that relationship could in-

terfere with her "deciding the facts of this case based upon the law," she replied,

No, it would not. The problem I have is from what I heard, the gun was supposed to accidentally went off. My dad was a game warden. I've lived in a house with guns all my life, loaded guns, taught hunter safety. My brother taught hunter safety, my sons taught hunter safety. It's not impossible, but it's improbable to me—

She was interrupted at that point by the prosecutor, and the following exchange took place:

Prosecutor: Could you wait to make your determination of whether that happened in this case until you've heard all the evidence?

Juror: *I have pretty much made up my mind on that.*

Prosecutor: If the judge were to instruct you to set that aside, would you be able to make your decision based on what you hear in court? I mean, I'm not telling you not to use your common sense and your life experiences, but in judging this case whether or not he's guilty or not guilty, could you set aside any previous opinions you might have and reach a decision based upon the law and the evidence in the case?

Juror: *It would still be in the back of my mind.*

Judge: Let me ask you this. When you come in—everybody comes in with their life's experiences, everybody comes in here—nobody comes in here with a clean, empty blackboard of a mind. They all come in with certain beliefs and things. What I'm asking you is, when you—the evidence you hear in this courtroom, and the law that I give you, that will you be able to make a decision based on the evidence using your common sense and

listening to the evidence and following the law that I give you? Can you make your decision on that, and put aside any preconceived notions at the same time?

Juror: Common sense, I believe I could.

(Emphasis added.)

The judge then allowed defense counsel to ask questions, and the following discussion took place:

Defense: You said based upon your family's history of having guns and using guns, and something about a hunter's course, that you are skeptical that a gun would go off accidentally. Is that right?

Juror: Uh-huh. [Indicating the affirmative.]

Defense: So if you were to hear evidence at the trial that—from the defense that—or you know by Rick Gabbard, "The gun accidentally went off in my hand.", are you saying that based on your experience and your family's experience, and your knowledge of firearms and their knowledge of firearms, and handling them that you would not really believe that?

Juror: I would do as the judge instructed me and put it aside.

Defense: Are you sure that you could put that aside or would you—you know, I mean, that's kind of hard to—

Juror: It is hard.

Defense: —to say for sure, because I thought earlier, hearing that what you said, from what you knew about the case, you—and your own family's history—that you didn't think that the gun would go off accidentally?

Juror: I said it was, it's not impossible, but it's improbable.

Defense: Okay, could you explain more what you mean by that?

Juror: It's not impossible that accidents do happen, but to my knowledge of firearms, it's improbable if handled correctly.

Defense: Okay, so you're leaning against, I mean, and if I'm misstating it, please let us know that. You say that it's not probable. In your mind, does that mean that you think it's a lot more likely that it didn't go off accidentally?

Juror: Yes.

Judge: I'll ask you this question, now you worked with [Appellant's sister] for ten years, so you kind of got, you're sort of got two—

Juror: Yes, I'm caught between the two.

Judge: You're the tug o' war party here. So, if you're chosen to sit on this jury, and the Commonwealth has got to prove it beyond a reasonable doubt that the defendant is guilty, and the defendant's presumed to be innocent. And if you're unsatisfied that the Commonwealth has shown guilty beyond a reasonable doubt, could you find the defendant not guilty?

Juror: Yes, I could.

Judge: And if you were satisfied that the defendant was guilty beyond a reasonable doubt, you could do that?

Juror: Yes, I could.

The court then allowed more defense questions:

Defense: Based on what you said about the history of using firearms and firearms in your family, you would approach it, you're skeptical that the gun could go off by accident?

Juror: Yes, I am skeptical

Defense: Is that fair to say, that you're skeptical of that right now? And that skepticism won't go away, will it, just based on the facets from your personal history?

Juror: Um, I could listen to it, yes. And I could take everything into consideration.

Defense: Okay. But—

Juror: But I still have my own opinions.

Defense: Okay, and part of your own opinions are based on your own—

Juror: My own personal experience.

Defense: —your own personal experience and your own belief based on that that guns—it's a lot more likely that they do not go off accidentally, is that right?

Juror: More or less that they don't go off accidentally.

Prosecutor: Would you agree with me that anybody with common sense knows it's much more probable that the gun goes off when somebody pulls the trigger than it just goes off by itself?

Juror: Oh, yes.

The juror then indicated that she knew members of the victim's family—specifically the victim's father and his grandchildren (the victim's nephews and nieces)—who she "had ... in school." She did not know them socially but said she spoke with them "on a regular basis." She did not live near them.

The following discussion then took place:

Defense: Based on—you said that, you know, you had heard, I guess, things about the case. *Do you have an opinion about it?*

Juror: *Right now, I do, yes.*

Defense: *What is your opinion?*

Juror: *That's he's guilty.*

Judge: Okay, and you've heard that on unsworn testimony, things you've heard just out—

Juror: Just in the community. Nothing from nobody in specific.

Judge: Okay, and that's just what you've heard from—would be able to still make your decision on what you hear here, from the sworn testimony and the law that you're given?

Juror: Yes, I could.

(Emphasis added.)

The prosecutor said he thought she was qualified, focusing on her claims that she could set her beliefs aside. Defense counsel moved to strike her for cause, claiming that once the juror expresses a belief she cannot be rehabilitated with the "magic incantation" that she could set that belief aside and citing *Montgomery v. Commonwealth*, 819 S.W.2d 713 (Ky.1991).

The court then stated:

This one's a tough one for this reason: it doesn't bother me about the—I'm not really concerned about the gun part because she said she was open to the possibility. I know the case you're talking about, because it says you can't—the thing she's got here, she works with her [sic] sister, and I think the way she said that, the way I took it, it's just that she—this is the way I read that case you were talking about, I'm not sure of the name of it, I read about the magical words don't just eliminate it. She works with this, she sees this girl every day. She sees the Davidson's children. She said that her dad was a game warden, just for the record, and teaches hunter's safety courses. She said she was open to the possibility of the evidence. She also said she could find him guilty or not guilty. And then she said, based on what she heard out in the community, and I'm thinking from what—that case you're talking about says that if they've formed an opinion, you can't just wipe it away. But the way I took what she was saying was, she's heard—it's a close one. Anything else you want to say about it?

The prosecutor then made some comments, including, "How in a small town do you not have an opinion?" The court continued:

It's kind of like with her, when you hear something, you're gonna hear certain facts, and the way she talked, I think—and this might just be my personally knowing her, but the way she talked, with the relationship, every—seeing the sister every day, I'm just still not sure which one she's the better juror for, because I—and I might be tainted by knowing her, but this lady here, I don't know which way she's the better juror for right now. Right this very second. I'm just trying to balance it both ways. She seemed like she would be a better juror for the Commonwealth, but she's, she is, Mrs. B[- - - - - -] is my—and this has nothing to do with anything, I'm just telling you where I'm coming from. My mom's a B[- - - - - -]. She was my mom's second cousin. She's a—she works with—she has connections with both families. She said what she was, what she knew about the gun, and that she was open to the possibility. Then you asked her—she's just telling you all she knows and as an afterthought, she said, from what she heard, she could have formed—she had an opinion. But I don't think her opinion is—she said she could set it aside, which Mr. Nelson [the defense counsel] quoted it correctly. I think, I think [she] is—she's not a perfect juror, but I think [she] is probably—could give both of you all a fair trial. That's my take on it. That's my take. And like I said, in my mindset right now I think Mr. Nelson probably thinks she's a worse juror for him than you. But I'm not sure she is. That's just my take on her, because I've known her a long time.

The prosecutor then stated he was at a disadvantage because he did not know these jurors and that the juror might "know the magic words" and want to sit on the jury, but that neither he nor the defense counsel wanted such a juror. The court then discussed the "magic words" case, noting that he thought this juror was different from the one in that case.

The prosecutor, recognizing that it was a difficult decision, noted that the appellate courts could possibly reverse the trial court for leaving the juror on but could not for taking her off the jury. And while he thought she was qualified, he stated he was trying to look at it from all three aspects.

The judge stated he was inclined to leave the juror on but stated that his notes indicated that a juror who had formed an opinion should be excused. The Commonwealth then suggested they play it safe, keeping her around only in the event that there were not enough jurors otherwise. The defense counsel stated he had not heard of that procedure as an option.

The court declined this option, stating instead that he would just leave her on the jury, noting for the record that what she said was "not the classic case of forming an opinion," and that he did not think either side would strike her with a peremptory. He also thought the juror could be fair, and noted that everyone in the town would have to say they had an opinion because the town was so small, noting it had less than 1,000 people.[1] He also noted that the "totality of this juror's circumstances" made him think she could be impartial and doubted even that the de-

---

1. This figure is somewhat misleading, since the venire should be drawn from the entire population of Lee County, which according to the U.S. Census, is about seven times that of Beattyville, which is the county seat and the town to which the judge was referring.

fense would use a peremptory strike on her.

When asked if the defense motion to strike for cause was overruled, the court said, "It's overruled very reluctantly and timidly and antennas are up and beads of sweat are starting to pop out. So I'm concerned about this one. But I think I'm making the right decision on this." He then recommended that they break for lunch but noted that he might "come back and revisit this one."

After lunch, the judge indicated he had read a case from 1993 covering jurors like the second juror and that the case indicated that such a juror should be struck only if she had both detailed knowledge about the case and had formed an opinion about the guilt or innocence of the defendant.[2] Based on this case, he felt he needed to hear from the juror to see if she had detailed knowledge of the case. She was called up and the following discussion ensued:

Court: Your knowledge of the case. How would you describe your knowledge of the case?

Juror: Very limited.

Court: Okay. You want to ask any questions?

Defense: I think that … you'd said before that, from either what you knew about the case or what you had heard and that you had an opinion and that you think that Rick was guilty

Juror: Uh-huh.

Defense: And what was—we didn't really ask you what about exactly what that knowledge was that led you to believe that.

Juror: The only thing I heard that he was supposedly been cleaning his gun,

the gun went off and shot her. That's all.

Prosecutor: That all you heard?

Juror: That's it.

Defense: And what was it about that that made you think that he was guilty?

Juror: It's just to me, it's like I said, improbable for the gun to go off when you're cleaning it.

Court: [to the prosecutor] Any questions?

Prosecutor: Who did you hear that from?

Juror: I don't even know, just in passing.

Presumably the judge was satisfied with the juror's answers because he did not discuss her further after she returned to the gallery.

The second juror Appellant complains of was the head teller at a local bank. He had known the victim's family for a long time, having worked with the victim's father in the past and having referred business to the victim, who he had known professionally for about ten years and who worked at a finance company. He spoke frequently with the victim in the course of their business dealings, describing their contact as "daily," though he did not go to her funeral. He also stated that the victim's father's wife was one of his customers at the bank, that she was a good customer, and that he wanted to keep her business. He was also a neighbor of Appellant's parents, who lived down the street from him, and knew other relatives of Appellant through work.

He admitted to having heard things about the case "on the street" from cus-

2. The court called the case the *Thompson* case," but may have been referring to *Thomas v. Commonwealth,* 864 S.W.2d 252 (Ky.1993).

tomers at the bank, including that the Appellant was on drugs or drunk and shot the victim. He described his knowledge about the case as not detailed and as limited to what he had read in the paper and heard from customers at the bank. He said that if the evidence matched what he had heard, he would think the Appellant was guilty and should serve time. He also described the situation as a tragic one that was preventable, and noted that a person should take responsibility when handling a firearm, even when intoxicated, but did not express an opinion about this case particularly.

He stated that he could separate his knowledge from "the street" from the evidence that was presented at trial and decide the case only on that evidence. In response to an unusual but insightful set of questions from the trial judge, the juror stated that if he were a defendant, he would be comfortable being tried by a jury composed of people like himself, so long as they could distinguish between what they had heard on the street and the evidence at trial and thus make an impartial decision. He then reiterated that he could make such a distinction. In response to further questions from the judge, he also said that he could make the prosecution prove its case and presume Appellant was innocent, though he stumbled at first in reaching the latter conclusion, saying at first he "guessed" he could.

Defense counsel argued that the juror had a conflict of interest because of the business relationship, had formed an opinion about the case based on his assertion that if the facts were as he had heard then Appellant deserved to serve time, and had hesitated in saying he could presume innocence.

Though the judge expressed concern that the juror hesitated about presuming Appellant was innocent, he concluded that the hesitation alone was not sufficient to strike the juror. The judge also noted that the relationship with the victim was only a business relationship (and the juror was not the owner of the bank), that he had stated he could be fair, and that the juror did not have detailed knowledge. Based on this, the judge declined to excuse the juror.

Defense counsel used peremptory strikes against both jurors of whom Appellant now complains. On the strike sheet, defense counsel also named two other jurors he would have struck with peremptories had his for-cause strikes been granted. One of these two jurors actually sat on the jury that convicted Appellant.

As the description above demonstrates, the trial judge went to great lengths to ascertain whether the jurors had any bias or other disqualification. As to the first juror, he observed her demeanor, heard her answers to his and the attorneys' questions, and had personal knowledge of her as a resident of the community. It is obvious from the record that he struggled with the decision and recognized there were potential problems with allowing her on the jury, but ultimately concluded that she would be impartial. In reaching this decision, the judge placed great weight on the fact that she had connections to family members of both Appellant and the victim, which the judge saw as giving her a balance that made her an appealing juror to both the prosecution and the defense.

As to the second juror, the judge noted the hesitation of the juror but focused on the juror's claims that he could be fair and could consider the evidence over the gossip he had heard on the street. He expressly noted that there was insufficient evidence that the juror had a probability of bias or prejudice.

■ It is largely because of the familiarity both with what occurs during voir dire and the community that "[t]he law recognizes that the trial court is vested with broad discretion to determine whether a prospective juror should be excused for cause...." *Mabe v. Commonwealth*, 884 S.W.2d 668, 670 (Ky.1994). However, that discretion does not mean a trial judge's decision not to strike a juror for cause is beyond review by an appellate court.

Both jurors complained of here were "tough calls." The judge's handling of the second juror demonstrates the wisdom of deferring to the trial judge's discretion in most cases. The judge considered the limited relationship of the juror to the parties, his statements regarding his ability to consider the evidence and be fair, the fact that he had not yet formed an opinion in the case, and his lack of detailed knowledge, and concluded that this juror could be fair. Whether the juror's hesitation in answering the question about the presumption of innocence made him unable to sit on the jury is precisely the type of issue that a trial judge is best suited to decide, as the judge is able to take in the totality of the circumstances surrounding the hesitation and the hesitation itself. Though the juror was a tough call, this Court cannot say that the trial judge erred in making the call that he did.

The first juror, however, is a different story. She specifically stated that she had formed an opinion about the case, that she had made up her mind, and that she thought Appellant was guilty. She did not couch her claims as hypotheticals, unlike the second juror, who premised his statement about the Appellant deserving to serve time on the prosecutor's proving his case. Unfortunately, it appears that the trial judge, while giving special attention to whether the first juror could be fair and spending about half an hour in voir dire and discussions with the attorneys, ultimately focused on the wrong criteria in finding that the first juror would be impartial. That she had a connection to both the victim and the Appellant, or that she repeatedly said she could set aside her views and review the evidence and apply the law as instructed by the judge, could not undo the fact that she had also clearly indicated a bias. (If anything, that the juror had connections to the families exacerbated the problem by raising additional potential biases.) The juror had already stated that she had made up her mind and that she thought Appellant was guilty.

Defense counsel was correct that a juror who has already formed such opinions cannot be rehabilitated. As this Court noted in *Montgomery,* the case relied on by the defense at trial:

One of the myths arising from the folklore surrounding jury selection is that a juror who has made answers which would otherwise disqualify him by reason of bias or prejudice may be rehabilitated by being asked whether he can put aside his personal knowledge, his views, or those sentiments and opinions he has already, and decide the case instead based solely on the evidence presented in court and the court's instructions. This has come to be referred to in the vernacular as the "magic question." But, as Chief Justice Hughes observed in *United States v. Wood,* 299 U.S. 123, 146, 57 S.Ct. 177, 185, 81 L.Ed. 78 (1936), "[i]mpartiality is not a technical conception. It is a state of mind." A trial court's decision whether a juror possessed "this mental attitude of appropriate indifference" must be reviewed in the totality of circumstances. It is not limited to the juror's response to a "magic question." ...

There is no "magic" in the "magic question." It is just another question

where the answer *may* have some bearing on deciding whether a particular juror is disqualified by bias or prejudice, from whatever source, including pretrial publicity. The message from this decision to the trial court is the "magic question" does not provide a device to "rehabilitate" a juror who should be considered disqualified by his personal knowledge or his past experience, or his attitude as expressed on voir dire. We declare the concept of "rehabilitation" is a *misnomer* in the context of choosing qualified jurors and direct trial judges to remove it from their thinking and strike it from their lexicon.

819 S.W.2d at 717–18.

In making this decision, " 'the test is whether the nature and strength of the opinion formed are such as in law necessarily ... raise the presumption of partiality. The question thus presented is one of mixed law and fact....' " *Id.* at 717 (quoting *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)) (ellipses in original). The juror clearly stated her partiality in this case. That she later indicated she could listen to the evidence and follow the law did not undo her statements showing bias. *Id.* at 718 ("It makes no difference that the jurors claimed they could give the defendants a fair trial."). Thus, like in *Montgomery*, "the record is replete with circumstances establishing an inference of bias or prejudice on the part of [the] juror[ ] so pervasive that the juror[ ] [was] beyond being rehabilitated as [an] appropriate juror[ ] by affirmative answer to such a question, however well intentioned." *Id.*

Though the judge is to be commended in this case for inquiring extensively about the juror's possible bias, engaging in thoughtful deliberation about the juror's qualifications, and creating an extensive record for review, this Court concludes that the judge nevertheless abused his discretion in not striking the first juror for cause. The totality of the circumstances indicate that she did not possess the "mental attitude of appropriate indifference" that is required for a person to sit on a jury, as evidenced by her repeated statement that she had already formed the opinion that Appellant was guilty.

█ Because the first juror should have been struck for cause, Appellant was forced to remove her with a peremptory strike.

█ Though this Court's recent cases have not expressly required that a defendant identify the other jurors he would have struck if his for-cause strikes were granted in order to bring a claim under *Shane*, the wisdom of such a requirement has become clear. Thus, this Court concludes that in order to complain on appeal that he was denied a peremptory challenge by a trial judge's erroneous failure to grant a for-cause strike, the defendant must identify on his strike sheet any additional jurors he would have struck. Appellant did just that here by identifying two additional jurors he would have struck.

█ The question then is whether the trial court's erroneous failure to grant the for-cause strike is a reversible error. This Court has ruled that ordinarily, such an error affects a substantial right of a defendant and is presumed to be prejudicial. *Shane*, 243 S.W.3d at 341; *Thomas*, 864 S.W.2d at 259. However, such an error can be shown to be non-prejudicial if the other jurors the defendant would have used his peremptory strikes on do not actually sit on the jury. *See King v. Commonwealth*, 276 S.W.3d 270, 279 (Ky.2009). In such an instance, there can be no reversible error because the "Appellant received the jury he wanted," *id.,* and any error is "effectively cured," *id.* This ex-

ception to *Shane* is not applicable in this case because one of the jurors that Appellant would have struck did in fact sit on the jury. Thus, the presumption of prejudice in *Shane* has not been refuted. Therefore, Appellant's conviction must be reversed. *Shane*, 243 S.W.3d at 341.

Though Appellant's conviction is being reversed, it is necessary to address the other assignments of error as they are likely to recur on remand.

### B. Lay Witness Testimony

Appellant also claims that the trial court erred by not allowing him to ask the victim's daughters on cross-examination whether they told police at the scene that they thought the shooting had been accidental. He claims this would have been proper lay testimony under KRE 701, and that by barring this testimony, the trial court violated his right to confrontation by limiting his ability to impeach their testimony.

KRE 701 states:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are:

(a) Rationally based on the perception of the witness,

(b) Helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and

(c) Not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

In asking to have the victim's daughters testify that he accidentally shot the victim, Appellant essentially sought to introduce lay witness testimony as to the mental state of another person. The difficulty with such testimony is that "[s]tates of mind are not observable, of course, and

there is risk that such an opinion would be based on pure guesswork." Robert G. Lawson, *Kentucky Evidence Law Handbook* § 6.10[4], at 420 (4th ed. 2003) [hereinafter Lawson, *Kentucky Evidence Law* ].

■■ Because of this difficulty, under KRE 701 and the common law that preceded it, a lay witness is not ordinarily allowed to testify as to the mental state of another person. However, an "exception occurs if the opinion is based on the witness's own factual observations or perceptions." *Young v. Commonwealth,* 50 S.W.3d 148, 170 (Ky.2001). "[T]he 'collective facts rule' applies to this type of opinion if the witness is expressing an opinion about another's mental conditions and emotions 'as manifested to that witness.'" *Id.* (quoting *Commonwealth v. Sego,* 872 S.W.2d 441, 444 (Ky.1994)). As Professor Lawson has stated, "No such opinion should be admitted unless it is descriptive of the perceptions of the testifying witness ('short hand renditions') and none should be admitted when the witness can fully describe those perceptions without resort to opinion." Lawson, *Kentucky Evidence Law* § 6.10[4], at 421. Admission of such opinions should be limited to "situations in which observations of another's appearances and behaviors could produce a perception about the person's state of mind that would be reliable enough to aid jurors and that could not be communicated by the observer without resort to conclusory language ('she seemed to know the victim')." *Id.* § 6.10[4], at 420; *see also id.* § 6.05[5], at 411 (discussing the "collective facts" doctrine: "Known in other circles as the 'short-hand rendition' rule, it has been used to permit lay witnesses to use conclusions or phenomena where there exists no other feasible way for the witnesses to communicate their knowledge to the triers of fact." (citation omitted)).

Under this rule, that the victim's daughters were present in the house and observed both Appellant and the victim immediately before and after the shooting goes a long way toward being sufficient personal knowledge of the "collective facts" that they could properly testify as to their impression of Appellant's mental state at the time of the shooting. However, their perception of the event itself appears to have been limited, consisting only of hearing the gunshot. Absent something further tending to show accident—say, having heard Appellant trip just before the gunshot or a contemporaneous exclamation of surprise by Appellant (e.g., "Oops!")—the daughters' statements that the shooting was accidental could not be admissible because it could not be said that "the opinion can be drawn from the perceptions without 'irrational leaps of logic,' " id. § 6.05[4], at 409 (quoting Lynch v. City of Boston, 180 F.3d 1, 16 (1st Cir. 1999)), or that "the opinion 'is one which a normal person would draw on the basis of the observed facts,' " id. (quoting Torres v. County of Oakland, 758 F.2d 147, 149 (6th Cir.1985)). An opinion that the shooting was accidental based only on the perception of the behavior of the victim and Appellant in the moments leading up to and following the shooting simply stretches those perceptions beyond the limits allowed by the Rules of Evidence.

This is not to say, however, that on retrial the statements may not be admitted under any circumstances. If defense counsel can elicit further perceptions of the witness that can convince the trial judge the opinion is a "short-hand rendition" of the witness's perceptions and that such a rendition is the only adequate way to relate those perceptions to the jury, it will be within the trial court's discretion to admit the statement. Without such an additional showing, however, defense counsel will be limited to introducing testimony about the witnesses' perceptions themselves.

Beyond the lay witness opinion issue, Appellant also argues that the statements made to police soon after the shooting could be impeachment of the daughters' trial testimony. For example, Kim testified that she and her mother had been arguing with Appellant and that she was worried about her mother's safety, which appears to have differed substantially from the statements she made to police soon after the accident, where she failed to mention any argument or disturbance leading up to the shooting. Her claim in the statements that the shooting was an accident further demonstrates this difference. Though it is not clear how valuable such testimony would be as impeachment, since Appellant himself told police he had been arguing with the victim, the daughter's statement nevertheless could be admissible to impeach her testimony as possibly having been recently fabricated. In such a situation, Appellant would not be seeking to offer a lay opinion per se but to show that the witness's claims about the events of that night had changed. This would be proper cross-examination. Again, however, whether to admit such evidence will ultimately depend on the other evidence admitted at retrial and will lie in the trial judge's sound discretion.

## C. Evidence of Other Bad Acts

Appellant also claims error in the admission of two instances of threats to the victim and other persons involving his waving or pointing a gun. He argues that this evidence violated KRE 404(b)'s bar on evidence of other bad acts used to show character and action in conformity there-

with.[3]

Specifically, Appellant complains of the following testimony: (1) Several years before the shooting, Appellant and the victim had an argument at a friend's house during which Appellant waved a gun around and threatened to "shoot the house up." (2) Several weeks prior to the shooting, during the incident in which Appellant argued with the victim's father, Appellant drew his gun. Some time later, Appellant and the victim left on a four-wheel ATV, with Appellant pointing his gun at the victim.

The Commonwealth argues that this evidence shows lack of mistake or accident because it demonstrates prior instances of wanton conduct by Appellant. The logic in that claim is not apparent, since the Commonwealth is basically arguing that prior instances of wanton conduct tend to show that the charged wanton conduct was not accidental. If anything shows a lack of mistake or accident it is the fact that Appellant wielded a gun during these prior instances without firing it. They show that Appellant was able to wave or point a gun, even when his emotions ran high, without firing it, which makes the evidence at least slightly relevant as to whether Appellant's firing of the gun was an accident. Whether such evidence is admissible at retrial, however, still depends on whether it satisfies KRE 403's balancing test (i.e., by cautiously comparing probative value with the chance of undue prejudice under *Bell v. Commonwealth*, 875 S.W.2d 882, 889 (Ky.1994)), a decision that also falls squarely within the trial court's discretion and depends largely on the unique state of the evidence that might exist at retrial.

■ Appellant argues that threats against third parties are not admissible at all under KRE 404(b), and that both instances complained of involved such threats. While this Court has stated "specific threats directed against third parties are inadmissible," *Sherroan v. Commonwealth*, 142 S.W.3d 7, 18 (Ky.2004), the holding of that case is not that limiting. That language described the holding of pre-Rules cases, not the current state of the law. *Sherroan* went on to state that the older cases were largely in conformity with KRE 404(b), or at least "premised upon the same exclusionary policy," *id.*, but that "such evidence is admissible if offered for another purpose or inextricably intertwined with other evidence essential to the case," *id.* (citation omitted), as stated in the rule. In fact, the Court went on to hold in *Sherroan* that the KRE 404(b) analysis of the threats involved "supports the admission of Appellant's threat against the [third party]." *Id.* Thus, admissibility of threats against third parties is controlled by KRE 404(b) as described above.

### III. Conclusion

For the foregoing reasons, the judgment of the Lee Circuit Court is reversed and any further proceedings shall be in conformity with this opinion.

MINTON, C.J.; ABRAMSON, CUNNINGHAM, SCHRODER and SCOTT, JJ., concur. VENTERS, J., concurs except that he would hold that the trial court abused its discretion under KRE 404(b) by admitting into evidence

---

**3.** Appellant also argues that the Commonwealth violated the KRE 404(c) "reasonable notice" requirement for such also. This issue is rendered moot, at least as to the evidence that was previously admitted, because Appellant's conviction is being reversed and he now has notice of the prosecution's intent.

Appellant's threat to "shoot the house up" several years earlier and his flourishing of a gun several weeks earlier.