# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: FEBRUARY 18, 2021
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2019-SC-0486-MR

HAROLD EUGENE HAYES                                       APPELLANT

|  | ON APPEAL FROM PERRY CIRCUIT COURT |
|---|---|
| V. | HONORABLE ALISON C. WELLS, JUDGE |
|  | NO. 18-CR-00136 |

COMMONWEALTH OF KENTUCKY                            APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Harold Eugene Hayes appeals as a matter of right[1] from his murder conviction and sentence of fifty years' imprisonment. After careful review of the record and the applicable law, we affirm.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

On the afternoon of August 8, 2018, Terry Stidham was shot to death in his Toyota pickup truck on Elm Shoal Branch Road in Perry County, Kentucky. Thereafter, a grand jury indicted Hayes for murder, tampering with physical evidence, possession of a handgun by a convicted felon, and first-degree persistent felony offender ("PFO1").

During trial, testimony was presented that on the day of the murder, Hayes drove himself and three others – Crystal Campbell, Brenda Turner, and

---

[1] Ky. Const. § 110(2)(b).

Melvin Gross – to CLM Discount Tobacco Store in Combs, Kentucky in a white Chevy Impala owned by Campbell. The four had been at a child's birthday party but left to go get cigarettes. Testimony was presented that Hayes was a methamphetamine addict who was not in a good state of mind, often hallucinating and becoming paranoid and delusional.

When Hayes pulled up at CLM Discount Tobacco, Stidham drove by in his pickup truck. Hayes identified Stidham out loud, then turned the Impala around and began pursuing him. Outdoor surveillance cameras from the store recorded Stidham's pickup truck passing on KY 80 toward Combs at 2:22:03 p.m.; and the white Impala turning around in the parking lot to follow it at 2:22:38 p.m. Campbell testified that Hayes followed Stidham because he believed Stidham was following him. Stidham turned onto Elm Shoal Branch Road and Hayes trailed him.

Mark Taylor, who lived on Elm Shoal Branch Road, testified that he knew Stidham, heard the distinctive sound of Stidham's muffler as he passed Taylor's home that afternoon, and figured Stidham coming to see him. Taylor went to the front door and saw Stidham turn his truck around in the "wide spot" of the road, as he usually did before returning to park at Taylor's. Taylor observed a white Impala stop in the middle of the road and someone jumped out. This person, whom Taylor could not identify, approached Stidham in his truck and Taylor heard him ask Stidham why he had followed so closely up on Hospital Hill. Taylor then heard three gunshots and saw the white car immediately leave the holler. Taylor approached Stidham's truck and saw that

2

Stidham appeared to be dead. Calling 911, Taylor reported the incident and said the car that had just left the scene was a four-door white Impala.

Campbell and Turner similarly testified that Hayes stopped in the road across from Stidham's truck, stepped out of the car, confronted Stidham about following him, then shot him three times. Hayes then drove back to CLM Discount Tobacco, where Gross and he went inside and bought cigarettes. The surveillance video recording of the front parking lot showed the white Impala returning at 2:27:18 p.m., with Hayes exiting the driver's door and Gross exiting behind him. This occurred less than five minutes from when Hayes originally left the store's parking lot to pursue Stidham. A round trip between CLM Discount Tobacco and the shooting scene takes about three minutes at a normal rate of speed. After leaving the store, Hayes dropped off the other three individuals at various locations then somehow disposed of the Impala.

Police found Stidham slumped over in the driver's seat of his truck. The windows of the truck were down and two spent Federal 9mm Luger cartridge casings were on the gravel on the passenger side of the truck, near the road. A third spent Federal 9mm Luger cartridge casing rested on the dashboard, above the glove box. Camera footage from the Walmart in Hazard showed Hayes and Campbell purchasing a box of Federal brand 9mm ammunition after midnight on August 7-8, less than 24 hours before Stidham was shot.

A state police trooper arrested Hayes the day after the shooting. Hayes did not have the gun, but he had four unfired Hornaday brand 9mm Luger cartridges in his pocket. Detective Stamper recovered a partial projectile from

inside the driver's door of Stidham's truck.  Other detectives collected two spent Federal 9mm Luger cartridge casings from outside Campbell's home.  Campbell's neighbor, Buster Napier, testified that he saw Hayes empty a handgun's magazine by shooting outside of Campbell's home, prior to August 8.  The five Federal 9mm Luger cartridge casings – three from the shooting scene and two from outside Campbell's house – were fired from the same unknown weapon.

At trial, the jury heard a recorded phone conversation from Hayes, who was incarcerated, and Campbell, during which Hayes berated Campbell for talking to police.  Their recorded conversation included the following exchange:

Hayes:      I'm in here because of you motherfuckers, is why I'm in here.

Campbell:   I don't believe so.

Hayes:      Yeah I am.  Sure am.

Campbell:   No.  I'm afraid you ain't.

Hayes:      Yep, I am too.

Campbell:   You can sing that all day.  It don't matter.

Hayes:      Well, yeah, I done it.  Yeah, I sure the fuck did.  But by God you didn't have to tell on me.

Hayes did not testify at trial, but Campbell did, and said she was scared to be in court testifying.  At the close of the evidence, Hayes moved for a directed verdict on the murder count, arguing that the evidence indicated he acted under extreme emotional disturbance ("EED") and thus only supported a conviction for the lesser offense of manslaughter.  The trial court denied that motion but did direct a verdict in Hayes' favor on the tampering with physical

4

evidence count. As to the possession of a handgun count, the court dismissed it on the Commonwealth's motion. The trial court instructed the jury on EED, self-protection (including imperfect) and all degrees of homicide. Ultimately, the jury found Hayes guilty of murder and recommended a sentence of fifty years' imprisonment, which the trial court imposed. This appeal followed.

## II.      ANALYSIS

On appeal, Hayes raises four claims of error, which we will review in turn.

### A. The trial court properly denied Hayes' motion for a directed verdict on the murder count.

Hayes moved for a directed verdict on the murder count at the close of the Commonwealth's case-in-chief and renewed his motion at the close of all the evidence. He argued that the evidence indicated that he acted under EED and thus only supported a conviction for the lesser offense of manslaughter. Following the trial court's denial of his motion, Hayes did not object to the trial court instructing the jury on murder; he only objected to an alternative instruction for intentional and wanton murder on grounds that it would lead to a non-unanimous verdict. The trial court agreed and instructed the jury on intentional murder as well as each of the lesser-included homicide offenses, including provisions for EED and self-protection.

> An instruction on a lesser included offense is required only if, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that he is guilty of the lesser offense. When faced with a sufficiency-of-the-evidence challenge such as the failure to grant a directed verdict on a particular crime or erroneously giving a jury instruction on a

5

particular crime, the appellate court must determine whether, after viewing the evidence in the light most favorable to the Commonwealth, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Commonwealth v. Hasch*, 421 S.W.3d 349, 356–57 (Ky. 2013) (internal quotations and citations omitted). Thus, in reviewing Hayes' claim that he was entitled to a directed verdict, we must determine whether the Commonwealth presented sufficient evidence to sustain the conviction for murder.

Hayes asserts that his methamphetamine use, which caused him to hallucinate and become paranoid and delusional, combined with the fact that Stidham had been following him, showed that Hayes was acting under EED. KRS[2] 507.020 allows for the reduction of a murder charge to first-degree manslaughter upon a showing that the accused intended to kill the victim but "acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be."

KRS 507.030(1) states that a person is guilty of manslaughter in the first degree when:

> (b) With intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he acts under the influence of extreme emotional disturbance, as defined in subsection (1)(a) of KRS 507.020[.]

This Court has defined "extreme emotional disturbance" as follows:

---

[2] Kentucky Revised Statutes.

6

Extreme emotional disturbance is a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance rather than from evil or malicious purposes. It is not a mental disease in itself, and an enraged, inflamed, or disturbed emotional state does not constitute an extreme emotional disturbance unless there is a reasonable explanation or excuse therefor, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under circumstances as defendant believed them to be.

*Commonwealth v. Rank*, 494 S.W.3d 476, 482–83 (Ky. 2016) (citation omitted).

Hayes maintains that his poor mental state led him to confront what he believed to be aggressive behavior on the part of Stidham. Hayes believed Stidham had been following him and Campbell; he points to Campbell's testimony that Stidham had parked in front of her home a month or so prior to the shooting and when Hayes asked him what he was doing, Stidham did not respond and drove off. Campbell further testified that the evening before the shooting, Stidham's and Hayes' vehicles chased each other around the parking lot of Appalachian Regional Hospital before driving off.

Accordingly, Hayes claims that seeing Stidham drive by the CLM Tobacco less than twenty-four hours after the hospital parking lot chase was a "triggering event" that led him to pursue Stidham's truck and shoot him multiple times. He argues the evidence demonstrated that he was acting under EED and thus the jury should have only been instructed on first-degree manslaughter, and the trial court should have directed a verdict in his favor on the murder count.

7

This Court has held that a substantial connection is required between an alleged provocation and an EED response:

> The EED defense requires a triggering event that provokes the disturbance, and this Court has held that the triggering event may include the cumulative impact of a series of related events. While a triggering event does not have to immediately precede a criminal act, it must be sudden and uninterrupted. Because one's emotional response to a situation may dissipate over time, a subsidiary inquiry arises as to whether there intervened between the provocation and the resulting homicide a cooling-off period of sufficient duration that the provocation should no longer be regarded as adequate.

*Posey v. Commonwealth*, 595 S.W.3d 81, 85 (Ky. 2019) (internal quotations and citations omitted).

Even if Campbell's account of the vehicle chase around the hospital parking lot was true (notably, outdoor surveillance cameras of the hospital parking lot did not capture the alleged chase), reasonable jurors still could have concluded that Hayes had a sufficient cooling-off period from the alleged provocation in the parking lot to spotting Stidham driving by the CLM Discount Tobacco the next day so as to sever the required connection. Reasonable jurors could have also concluded that even if Hayes had felt enraged after seeing Stidham's truck drive by the CLM Discount Tobacco, no reasonable excuse or explanation existed for pursuing Stidham and shooting him three times. Furthermore, however flimsy this was as a triggering event, the trial court still instructed the jury on EED. Given that a reasonable jury could have determined that the evidence did not show that Hayes was acting under EED,

8

but rather supported a murder conviction, the trial court did not err by instructing it accordingly.

## B. The trial court properly denied Hayes' motion to suppress.

Before trial, Hayes moved to suppress evidence of the two shell casings found on separate dates near the perimeter of the house Campbell occupied. Hayes argued that police failed to secure a search warrant prior to entering the property and thus the search was unlawful. The trial court conducted a suppression hearing, at which Detectives Huff and Gabbard testified, and thereafter entered written findings of fact and conclusions of law denying Hayes' motion to suppress.[3]

Detective Huff testified that on August 12, 2018, he went to Campbell's house to question her about the 9mm ammunition that Walmart video surveillance showed her and Hayes purchasing the day before the shooting. Detective Huff testified that he had made it clear to Campbell that she did not have to speak to him. Campbell invited him inside, told him about buying the ammunition for Hayes, and discussed the shooting. She also said that Hayes had previously shot at her, showed Detective Huff the bullet holes on the interior walls, and showed him multiple bruises where Hayes had assaulted her. She said that Hayes had also shot at her neighbor, Buster Napier.

---

[3] On appeal, the Commonwealth challenges Hayes' standing to seek suppression of the shell casings, arguing that he had no expectation of privacy because the house was Campbell's residence, she owned it, and Hayes merely stayed there at her pleasure. However, because the Commonwealth failed to raise the issue of standing at the trial court, we decline to address it.

9

Campbell permitted Detective Huff to take pictures, which he did, and he unsuccessfully searched for shell casings outside the home. He testified that Campbell gave complete and continuing permission to be on the premises for the purposes of any continued investigation.

On August 16, Detective Huff returned to Campbell's home with Detective Stamper to look for shell casings. Detective Huff knocked on the front door, then the back door, but Campbell was not home. Outside the back door, Detective Huff noticed and retrieved a shell case in plain view on the landing. Detective Huff testified that later, when reviewing the photographs he had taken on August 12, this shell case could be seen in one of the pictures.

Detective Huff returned to Campbell's home on August 23 to look for projectiles where Campbell had shown him holes in the walls. She was home and again gave him consent to be there. He did not find any shell casings.

The night of August 26-27, Campbell's house caught fire. The fire department extinguished it and dispatch indicated that the caller had requested an arson investigation. Detectives Huff and Collins accompanied the arson investigator, Detective Gabbard, to Campbell's house; Detective Huff called Campbell on the way and asked if she needed assistance – particularly with regards to an arson investigation. She told him she did, as she felt threatened and that someone was watching her and had tried to burn down her house.

Based on his arson investigation, Detective Gabbard concluded that the fire was not set intentionally, but rather originated from a faulty electrical

outlet. At this point, the detectives received additional information from Campbell's neighbor, Buster Napier, concerning Hayes and the use of a firearm outside Campbell's residence. Napier showed the detectives where Hayes had been standing when he shot at him; there, the detectives found another 9mm shell case in plain view, at the base of the front porch rail.

Based on the testimony at the suppression hearing, the trial court found that Campbell had given the officers complete and continuing permission to be on the premises for the purposes of any continued investigation. The court noted that Campbell never revoked her consent for investigating officers to be at her residence, but instead renewed it. The court's conclusions of law discussed curtilage, the plain view doctrine, and the consent of the homeowner as exceptions to the search warrant requirement. The court noted that the officers were lawfully present at the home, were in position to see the shell casings they discovered, which were in plain view, and the significance of the shell casings was readily apparent to the officers. The court further observed that the casings could have been inadvertently discovered by the officers. Accordingly, the trial court denied Hayes' motion to suppress evidence of the shell casings.

"When reviewing a trial court's denial of a motion to suppress, we utilize a clear error standard of review for factual findings and a de novo standard of review for conclusions of law." *Sykes v. Commonwealth*, 453 S.W.3d 722, 724 (Ky. 2015) (quotations and citation omitted).

11

"The Fourth Amendment to the United States Constitution and Section 10 of the Kentucky Constitution guarantee the individual right to be free from unreasonable searches and seizures." *Whitlow v. Commonwealth*, 575 S.W.3d 663, 669 (Ky. 2019).[4] "Generally, warrantless searches are unreasonable unless the search falls under one of the exceptions to the warrant requirement." *Id.* Moreover, police may not enter the protected curtilage of the home without a search warrant or an exception to the warrant requirement. *Quintana v. Commonwealth*, 276 S.W.3d 753, 757 (Ky. 2008). The law treats curtilage of a home as part of the home for Fourth Amendment purposes. *Id.* Under the exclusionary rule, suppression of evidence is the proper remedy for violations of the Fourth Amendment. *Id.* "The Commonwealth bears the burden of establishing the constitutional validity of a warrantless search." *Commonwealth v. Lane*, 553 S.W.3d 203, 206 (Ky. 2018).

However, "warrantless searches of a residence based upon the consent of a person with the authority to give such permission is a well-established exception to the warrant requirement." *Simpson v. Commonwealth*, 474 S.W.3d 544, 548 (Ky. 2015). Another exception to the warrant requirement is the

---

[4] The Fourth Amendment to the United States Constitution states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Further, the Kentucky Constitution provides that "[t]he people shall be secure in their persons, houses, papers and possessions, from unreasonable search and seizure; and no warrant shall issue to search any place, or seize any person or thing, without describing them as nearly as may be, nor without probable cause supported by oath or affirmation." Ky. Const. § 10.

"plain view" doctrine, which applies when an object is plainly visible to officers who are lawfully in a position to view the object, and the object's incriminating nature is readily apparent. *Chavies v. Commonwealth*, 354 S.W.3d 103, 109 (Ky. 2011).

Hayes argues that the trial court's finding that Campbell gave the officers complete and ongoing permission to be on her premises for the purpose of any continued investigation was not supported by substantial evidence, as the only evidence of her consent was Detective Huff's testimony. However, Detective Huff's uncontradicted testimony was itself substantial evidence. *See Payton v. Commonwealth*, 327 S.W.3d 468, 472 (Ky. 2010). In *Payton*, the parties disagreed as to whether the defendant's wife knew when she invited an officer into the residence that he wanted to search it. The Court held that the officer's testimony that he told her he would like to search the home was substantial evidence supporting the trial court's finding that he requested to search before entering the home. *Id.*

Here, the detectives discovered and collected two shell casings in plain view during lawful entries onto the curtilage of Campbell's residence. The testimony at the suppression hearing constituted substantial evidence to support the trial court's finding that Campbell gave the officers valid, ongoing consent to search her residence, which included the curtilage of the home, and that the shell casings were found in plain view near the home perimeter, where the officers had a lawful right to be. The trial court's correct application of the law to the facts supports a conclusion that Campbell consented to the search

13

and thus, the court properly denied Hayes' motion to suppress evidence of the two shell casings.

### C. The trial court properly denied Hayes' motion to strike Juror 319 for cause.

Hayes argues that he was denied his due process right to a fair trial because of the trial court's refusal to strike Juror 319 for cause. Hayes therefore had to exercise a peremptory challenge to remove that juror. On the juror strike sheet, Hayes indicated that he would have used a peremptory challenge on Juror 444 had he not had to use one on Juror 319. Juror 444 sat on the jury. Hayes now argues that if the trial court had properly removed Juror 319 for cause, Juror 444 would not have sat on the venire panel, which he claims prejudiced him.

"[I]n order to complain on appeal that he was denied a peremptory challenge by a trial judge's erroneous failure to grant a for-cause strike, the defendant must identify on his strike sheet any additional jurors he would have struck." *Gabbard v. Commonwealth*, 297 S.W.3d 844, 854 (Ky. 2009). And the identified juror must sit on the jury. *Id.* at 855. If that juror is randomly selected to be excused as an alternate and does not participate in deliberations, there can be no reversible error. *Grubb v. Norton Hosps., Inc.*, 401 S.W.3d 483, 488 (Ky. 2013).

Hayes properly preserved his claim of error by denoting on his strike sheet in accordance with the standard set forth in *Gabbard.* Nevertheless, the Commonwealth maintains that Hayes waived this claim of error by agreeing to excuse Jurors 309 and 942 at the close of all the evidence, thus removing both

14

alternates and ensuring that Juror 444 would sit on the jury. During voir dire, Juror 942 informed the court that her son would graduate high school the evening of Friday, June 7. The court expected the trial to be finished by then so Juror 942 was not excused. When the evidence closed on June 7, the Commonwealth and Hayes agreed to excuse Juror 942 and the trial court so ordered.

The parties also agreed to excuse Juror 309, who informed the court on Thursday, June 6, that her husband had surprised her with concert tickets and a hotel reservation in Roanoke, Virginia for the following evening. She asked if she would need to cancel the reservation. Hayes' attorney suggested to the court that if all the jurors showed up the next day, then Juror 309 could be excused. The court informed Juror 309 that it was possible she could be excused, but that it could not say for sure until the next day. At the close of the evidence the next day, the parties agreed to excuse Juror 309 and the trial court so ordered. The Commonwealth now argues that by agreeing to excuse Jurors 309 and 942, Hayes guaranteed that Juror 444 would deliberate, and thus waived any challenge to the jury pool's composition.

However, the root issue is whether the trial court improperly denied Hayes' motion to excuse Juror 319 for cause. That decision affected the composition of the panel, regardless of whether the parties subsequently agreed to excuse Jurors 309 and 942. Because Hayes objected to Juror 319 for cause, and then exercised a peremptory challenge to remove her, and

15

documented that he would have used his peremptory on Juror 444, who sat on the panel, we will address his complaint of error with respect to Juror 319.

During voir dire, Juror 319 stated that she knew the victim's mother, Ms. Stidham, had worked with her at Subway years before, but since then had only seen her in passing and had not seen her since Stidham's death. When asked if she felt sympathy for Stidham's mom, she said, "Yes, well yes. She lost her son. I mean anybody would." The Commonwealth asked her if her sympathy and knowing Ms. Stidham in the past would affect her ability to weigh the evidence and make an independent decision, to which she responded, "I would try my best not to." She further explained, "I would try my best. I think I could, but I would try my best. I do know her and I do feel sympathy for her but I don't know the case or anything, and I don't know anybody else in it." When asked if her sympathy and knowing Ms. Stidham would affect her, she responded, "It might, but I mean I'd try my best not to, but it might. I won't lie to you because I did know her and we were friends at one time."

Hayes' attorney suggested to Juror 319 that it sounded as though she and Ms. Stidham were close friends. She said, "Well we worked together; you get close to people you work with. But like I said, it's been awhile since I've seen her. But yeah, I do feel bad that she lost her son. I mean, anybody would." Hayes' attorney asked her whether she thought about her. She answered, "Of course. Anybody would." Counsel then asked if she had thought about what must have happened. She said, "Well, of course. I mean I've thought about what happened, but I don't know. I wasn't there. I don't

16

have any knowledge of what actually happened." Defense counsel asked her if she was glad to learn from the news that the perpetrator was caught, and she said, "Well, I mean I'm glad they got somebody for it because you don't want something like that to go unanswered, but I don' t know truthfully that it is him. I wasn't there. I don't know. I was glad somebody was – you know – but that's not good to put the blame on him."

Hayes' attorney mentioned Juror 319's natural sympathy for Ms. Stidham and asked whether – if some evidence supported a finding in Ms. Stidham's favor, and other evidence supported a different finding – she would tend to think of Ms. Stidham's need for closure in determining a verdict. Juror 319 responded, "I would try not to. I want to be honest with you. I'd try not to, but I couldn't – you know – you have to be in the place to know exactly what you would do. Or I do anyway." Hayes' counsel followed up with a brief explanation of the need to have jurors suitable to hear the case and asked about her own abilities once she was in the deliberation room. She said, "I understand where you're coming from – I mean – because I do feel sympathy for her. I don't want to lie to you. I don't. I would be afraid to know – it might. I don't want to say no. I don't want to say yes or no. I don't want to lie to you."

In response to follow-up questions by the Commonwealth, Juror 319 said she had not formed an opinion that Hayes had done it because she was not there and did not know. As to whether she could listen to the evidence and make a decision based solely on that she responded, "I'd try my best." Thereafter, the trial court denied Hayes' challenge for cause.

17

On appellate review, this Court will reverse the trial court's decision not to exclude a juror for cause only if that decision was an abuse of the trial court's discretion or was clearly erroneous. *Hammond v. Commonwealth*, 504 S.W.3d 44, 54 (Ky. 2016). RCr[5] 9.36(1) provides that a trial court shall excuse a juror for cause "[w]hen there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence[.]"

> In order to determine if a juror has the appropriate degree of impartiality, [t]he test is whether, after having heard all of the evidence, the prospective juror can conform his views to the requirements of the law and render a fair and impartial verdict. Any doubts about the ability of a juror to be fair and impartial should be construed in favor of a defendant.

*Paulley v. Commonwealth*, 323 S.W.3d 715, 721 (Ky. 2010) (internal quotations and citations omitted).

Further, "[t]he trial court's decision to exclude a juror for cause must be based on the totality of the circumstances rather than a response to any single question." *Hammond*, 504 S.W.3d at 54. "In making such a determination, the court must weigh the probability of bias or prejudice based on the entirety of the juror's responses and demeanor." *McDaniel v. Commonwealth*, 341 S.W.3d 89, 92 (Ky. 2011). "There is no 'magic question' that can rehabilitate a juror as impartiality is not a technical question but a state of mind." *Shane v. Commonwealth*, 243 S.W.3d 336, 338 (Ky. 2007).

Hayes argues that the trial court should have excused Juror 319 for cause because she did not unequivocally state that her relationship with, and

---

[5] Kentucky Rules of Criminal Procedure.

sympathy for, Ms. Stidham would not affect her ability to be fair and impartial. "[T]he court should presume the likelihood of prejudice on the part of the prospective juror because the potential juror has such a close relationship, be it familial, financial or situational, with any of the parties, counsel, victims or witnesses." *Ward v. Commonwealth*, 695 S.W.2d 404, 407 (Ky. 1985) (quotations and citation omitted). *See also Futrell v. Commonwealth*, 471 S.W.3d 258, 274 (Ky. 2015) (applying the rule set forth in *Ward*). However, Juror 319 did not state that she and Ms. Stidham enjoyed a close relationship; rather, she said that they worked together for a while and became friends, which can frequently occur in work environments. She further stated that she had not seen Ms. Stidham in a while and had not seen her since her son's death.

In *Hammond*, this Court addressed a factually similar situation, and affirmed the trial court's denial of the defendant's challenge for cause. As here, Hammond cited the juror's stated sympathy for the victim's family as grounds for excusal. That juror said she had gone to school with the murder victim's sister, did not have a personal relationship with her, but nevertheless felt sympathy for the victim's family. Specifically,

> When the Commonwealth asked [the juror] if she could put aside her sympathy for the victim's family and decide the case solely on the evidence, she said, "I guess my sympathy could impact, I guess it could." Defense counsel then followed up on the Commonwealth's questions about [the juror's] sympathies. She then responded that she would be objective and that she would not be influenced by her feeling of sympathy for the victim's family. The trial judge then asked [the juror] again if she could set aside her personal sympathy and decide the case solely on the evidence;

19

she said she could.

504 S.W.3d at 54.

In denying Hammond's motion to strike, the trial court construed the juror's expression of sympathy for the family as the "generic normal emotion that everybody has to some extent," rather than sympathy generated from a specific connection to a party or an interest in the case. *Id.* at 55. On appeal, this Court agreed, finding that the victim's "acknowledgment of sympathy was, at most, ambivalent before she said she would decide the case solely on the evidence, without the influence of sympathy." *Id. See also Hilton v. Commonwealth*, 539 S.W.3d 1, 14 (Ky. 2018) (trial court properly denied defense motion to exclude for cause as juror's emotional responses during voir dire indicated that she had no opinion of the defendant and could be objective, but did feel a general feeling of sadness and anger at the loss of life resulting from a vehicular collision, which the court found to be a natural reaction).

In the case at bar, based on the totality of the evidence, we are unpersuaded that the trial court's evaluation of Juror 319 and its ultimate determination that Juror 319 was fit to serve on the venire panel was an abuse of discretion or amounted to clear error. The record does not reveal a close personal, familial or financial relationship between Juror 319 and Ms. Stidham which would affect her ability to be impartial. Juror 319 said she had not formed an opinion of the case and would "try her best" to listen to the evidence and make a decision based solely on that. Thus, despite her initial indication of sympathy for a former co-worker, based on the totality of all her responses,

20

the record reflects her belief that she could remain impartial.  Juror 319 stated

that she had not formed an opinion of the case, did not know what had

happened because she was not there, and would try her best to form her

opinion of the case based on the evidence presented.  Based on her responses,

and in deferring to the trial court's position to view the demeanor of the juror,

and assess her fitness to serve, we are unable to say that the trial court abused

its discretion by not excusing Juror 319 for cause.

### D. The trial court properly denied Hayes' motion for a mistrial.

Hayes asserts that the trial court abused its discretion by denying his

motion for a mistrial.  Specifically, he complains that the testimony of Dwight

Eversole identifying Hayes as a felon was so prejudicial that it warranted a

mistrial.

The appellate standard for reviewing the denial of a mistrial is as follows:

> [T]he decision to grant a mistrial is within the trial court's
> discretion, and such a ruling will not be disturbed absent a
> showing of an abuse of that discretion.  The test for an abuse of
> discretion is whether the trial judge's decision was arbitrary,
> unreasonable, unfair, or unsupported by sound legal principles.
> Additionally, a mistrial is an extreme remedy and should be
> resorted to only when there is a fundamental defect in the
> proceedings and there is a manifest necessity for such an action.
> The cause of the need for mistrial must be of such character and
> magnitude that a litigant will be denied a fair and impartial trial
> and the prejudicial effect can be removed in no other way.

*Commonwealth v. Padgett,* 563 S.W.3d 639, 645 (Ky. 2018) (internal quotations

and citations omitted).  "The trial court has broad discretion in determining

when such a necessity exists because the trial judge is best situated

21

intelligently to make such a decision." *Matthews v. Commonwealth*, 163 S.W.3d 11, 17 (Ky. 2005) (internal quotations and citations omitted).

Prior to Eversole taking the stand, defense counsel approached the bench and informed the court that his testimony had the potential of being highly prejudicial. Apparently Eversole was aware of other criminal acts Hayes had been charged with, and of Hayes' poor treatment of Campbell. The Commonwealth indicated it would limit Eversole's testimony to his having observed Hayes with a 9mm handgun prior to the date of Stidham's shooting and said that it had warned the witness not to mention Hayes' other criminal acts.

Eversole testified that he had known Hayes for 30 years. In August, just prior to the shooting, he had walked by Campbell's house and saw Hayes working on an old white car in the driveway. The Commonwealth asked him if he saw anything unusual and Eversole said, "I mean I know he's a felon, you know. He was walking around with a 9mm in a holster, like he – like he was Barney Fife – I mean – like it was nothing." That was the extent of Eversole's direct testimony and Hayes did not cross-examine him. Instead, Hayes approached the bench and moved for a mistrial. In response, the Commonwealth suggested that the jury could be admonished that Eversole did not really know Hayes' status. Hayes did not request an admonition and the court did not give one. Instead, the court took Hayes' mistrial motion under consideration and advised the parties to submit any applicable law on the issue to her that evening. An hour later, the court adjourned for the day.

22

The next morning, the trial court conducted a hearing on Hayes' motion and thereafter denied it. The court found that the prejudicial statement was not intentionally elicited by the Commonwealth, and thus the Commonwealth did not act in bad faith. The court noted that Eversole's statement was a small part of the evidence and opined that it did not deny Hayes a fair and impartial trial. Though the court expressed concern that it had not immediately admonished the jury, it said it would do so that morning. When the jurors reconvened, the court admonished them to disregard the portion of Eversole's testimony the day before when he gave the opinion that Hayes is a felon and told them not to consider that evidence.

"[A]n admonition is usually sufficient to cure an erroneous admission of evidence, and there is a presumption that the jury will heed such an admonition." *St. Clair v. Commonwealth*, 455 S.W.3d 869, 892 (Ky. 2015) (citation omitted). "And admonitions are preferred over mistrials, which should be granted sparingly[.]" *Id.*

When a witness makes an unsolicited statement about a defendant's other crimes, as Eversole did here, this Court evaluates all the evidence to determine whether the defendant was unduly prejudiced by the isolated statement. *Matthews*, 163 S.W.3d at 17–18. In *Matthews*, the Court held that a witness's statement that the defendant "hadn't been out of prison that long" would have been cured by an admonition had the defendant not rejected the offer of one. *Id.* In so ruling, the Court relied in part on its decision in *Graves v. Commonwealth*, 17 S.W.3d 858 (Ky. 2000), wherein it upheld the denial of a

23

mistrial request following a witness's statement that he knew the defendant wasn't supposed to have a gun. The *Graves* court held that even if the witness's statement was an unambiguous reference to the defendant's prior felony conviction, it did not necessitate a mistrial because "this type of evidentiary error is easily cured by an admonition to the jury to disregard the testimony." *Id.* at 865. In other words, "an admonition to the jury cures an unsolicited reference to prior criminal acts." *Matthews*, 163 S.W.3d at 18.

Hayes argues that an admonition may have been effective had the trial court given it immediately after Eversole's statement, but the delay rendered the admonition ineffective, and only served to bring more attention to Eversole's statement. However, Hayes did not request an admonition immediately following Eversole's statement, even though the Commonwealth suggested it. A litigant who does not request an admonition cannot complain that one was not given. *See id.* For the same reason, Hayes cannot complain about the court's failure to timely admonish the jury when he did not request one. In total, Eversole's statement was not responsive to a question by the Commonwealth, the statement was brief and isolated, and the evidence presented at trial of Hayes' guilt was overwhelming. Thus, we do not believe that Hayes was unduly prejudiced by Eversole's comment so as to deprive him of a fair and impartial trial. *See Phillips v. Commonwealth*, 679 S.W.2d 235, 237 (Ky. 1984) (holding that victim's unsolicited testimony that defendant had previously escaped from prison did not unduly prejudice the defendant and necessitate a mistrial given all the evidence presented by the Commonwealth of

24

the defendant's guilt).  Accordingly, the trial court properly cured any error by admonishing the jury to disregard that portion of Eversole's testimony.  No manifest necessity mandated a mistrial.

## III.    CONCLUSION

For the foregoing reasons, the judgment of the Perry Circuit Court is affirmed.

All sitting.  All concur.

COUNSEL FOR APPELLANT:

Emily Holt Rhorer
Kathleen Kallaher Schmidt
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

James Daryl Havey
Assistant Attorney General