Michael McQUEEN, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2010–SC–000186–MR.

Supreme Court of Kentucky.

May 19, 2011.

Thomas More Ransdell, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, for appellant.

Jack Conway, Attorney General of Kentucky, Christian Kenneth Ray Miller, Assistant Attorney General, Office of the Attorney General, Office of Criminal Appeals, Frankfort, KY, for appellee.

Opinion of the Court by Justice SCOTT.

Appellant, Mike McQueen, was convicted by a Laurel Circuit Court jury of intentional murder and sentenced to thirty-two years' imprisonment. He now appeals as a matter of right. Ky. Const. § 110(2)(b)

## I. *Background*

McQueen and Christina Hodge, the victim, had a tumultuous multi-year relationship, complete with verbal abuse, suicide attempts, and repeated theft accusations. This turbulent relationship ended when McQueen shot Hodge, at point-blank range, in the back of her head. She died instantaneously.

There were no witnesses to the shooting, and McQueen did not put on any evidence at his trial. However, the jury heard McQueen's explanation of the events through the admission of his statement to the police. McQueen stated that on the morning of Hodge's death, he found what he believed was her suicide note, claiming, among other things, that she did not rob him. He then walked outside, carrying an unholstered gun in his pants, and noticed Hodge sitting cross-legged in the grass. She again repeated that she did not steal from him. According to McQueen, he asked her to come back inside and attempted to help her to her feet. Although he claims to not know what happened, he stated that when he was reaching for her shoulders, with his hands on her jacket, the gun somehow fired a bullet into Hodge's head. Although McQueen claimed the unholstered gun allegedly discharged by accident, there was no bullet hole in his pants.

After the shooting, McQueen ran to his parents' nearby trailer and conferred with his family before his brother eventually called 911.

Expert testimony established that the victim was shot, at a fairly level angle, through the back of her head, with the bullet piercing her spinal column and brain stem, and eventually lodging in her cheek. A firearms expert testified that the semi-automatic handgun McQueen used was functional and had two safeties. The external safety, when engaged, prevents the gun from firing; the internal safety prevents firing unless the trigger is pulled (the gun would not fire if it was dropped).

To undermine the credibility of McQueen's seemingly implausible explanation, the Commonwealth put on several witnesses that testified to McQueen's hostility toward the victim due to his suspicion that she was stealing from him. An acquaintance of McQueen's testified that several weeks before the shooting, McQueen told her that he was going to "blow [the victim's] brains out" because she was stealing from him. Furthermore, just hours before the shooting, McQueen told the victim's son, "You'd better tell your mom to stop stealing off me, or I'll break her face to where you can't tell she's human." Finally, Jeff Sweeney, who visited the house two days prior to the shooting, testified that he observed McQueen's hostile behavior toward the victim. According to this testimony, Hodge entered the kitchen area to get a soft drink, but McQueen, still angry that she was stealing from him, ordered her to "get the f—— back in" the other end of the trailer.

The jury presumably did not believe McQueen's version of events—that the gun just went off and shot the victim through the head—and found him guilty of intentional murder.

On appeal, McQueen raises four issues for our review. He contends that the trial court erred when it failed to direct a verdict of acquittal for the offense of intentional murder; that the trial court violated

his right to a randomly selected jury when it dismissed a qualified juror for cause; that the trial court's erroneous admission of unrelated bad acts denied him his right to a fair trial; and, that the trial court's exclusion of evidence relating to his demeanor following the shooting denied his right to present a complete defense. We find these contentions without merit, and detail our reasoning below.

## II. *Analysis*

### A. Directed Verdict

■ McQueen argues that the trial court deprived him of due process of law when it failed to direct a verdict of acquittal for the offense of intentional murder. He claims that the evidence did not support purposeful behavior, highlighting his self-serving statements that he tried to perform CPR and went for help after the shooting. Additionally, he notes that he had no gunshot residue on his hands, but that the victim did.[1] Accordingly, he claims that the Commonwealth's evidence failed to indicate he intentionally murdered the victim. Because the "evidence did not support a finding beyond a reasonable doubt that the shooting was intentional," McQueen claims we must reverse. We disagree.

■ The well-settled standard of review under which we evaluate a denial of directed verdict is much more deferential than the standard McQueen exhorts. When considering a motion for directed verdict:

[T]he trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the

evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

*Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky.1991). On appellate review, we affirm the trial court's denial of a directed verdict "[i]f under the evidence as a whole it would not be clearly unreasonable for a jury to find the defendant guilty...." *Commonwealth v. Sawhill,* 660 S.W.2d 3 (Ky.1983). We went on in *Benham* to further clarify the minimal burden to withstand a directed verdict motion, stating that "the trial court is expressly authorized to direct a verdict for the defendant if the prosecution produces *no more* than a mere scintilla of evidence." *Benham,* 816 S.W.2d at 187–88 (emphasis added).

In applying this standard to the present case, we conclude that the trial court did not err in denying McQueen's motion for directed verdict. As detailed in the facts, the jury heard testimony that McQueen suspected the victim was stealing from him and he told two witnesses that he was going to "blow [her] brains out" and "break her face" beyond the point of recognition. There was also expert testimony suggesting that McQueen's purported accidental discharge story was implausible. A firearms expert testified that the internal safety would prevent firing, unless the trigger was pulled (with eight pounds of

---

1. This claim is undeveloped in McQueen's brief and presumably also at trial, due to his failure to put on any direct evidence. However, he concedes that gunshot residue can be transferred to a person in close proximity to a discharged firearm. The Commonwealth counters by pointing out that there was a delay between the shooting and the 911 call and further notes that gunshot residue can easily be removed by washing, wiping, or placing one's hands in his pockets.

pressure). The medical examiner testified that the bullet trajectory was relatively level, not at a forty-five degree angle. This statement further undermines McQueen's claim that the gun fired while on his beltline area, when he was standing over the victim attempting to help her up.

Consequently, we hold that under the evidence presented, it was not "clearly unreasonable for a jury to find the defendant guilty" and that the Commonwealth introduced more that a "mere scintilla of evidence" that the shooting was intentional.

### B. Juror Selection

■ McQueen next alleges error occurred during the jury selection phase; thus, we pause to develop several additional facts necessary to properly address this allegation. During jury orientation, the trial court qualified the pool after examining them to ensure they met the basic criteria (*e.g.,* U.S. citizen, English speaker). The court inquired whether anyone was a convicted felon not pardoned by the Governor. Juror S.S. affirmatively acknowledged he was, although he informed the court that his civil rights had been restored. Nonetheless, the trial court excused S.S., erroneously believing that absent a gubernatorial pardon, a convicted felon is an unqualified juror. Neither of the parties was present during this preliminary qualification phase, thus no objection was made.[2]

McQueen argues that this excusal violated his right to a randomly selected jury. He correctly notes that the statute, amended in 2002, currently states that a juror is unqualified if he "[h]as been previously convicted of a felony and has not been pardoned *or received a restoration of civil rights* by the Governor or other authorized person of the jurisdiction in which

the person was convicted." KRS 29A.080(2)(e) (emphasis added). McQueen contends that the court's erroneous excusal of Juror S.S., a qualified juror, destroyed the randomness of the jury pool and was a substantial deviation from jury selection procedures. Furthermore, he asserts that this error was incapable of preservation, since his counsel was outside the courtroom negotiating a plea deal when this excusal occurred, and, even if present, he would not have been able to object since this excusal occurred at a private bench conference. We disagree.

■ Initially we note that the Administrative Procedures of the Court of Justice have not been amended and still state that a prospective juror is not qualified if he "[h]as been previously convicted of a felony and has not been pardoned by the governor or other authorized person of the jurisdiction in which the prospective juror was convicted." Part II, Section 8(2)(e). However, we need not resolve this inconsistency since McQueen failed to raise the irregularity prior to his examination of the jurors. RCr 9.34 states that "[a] motion raising an irregularity in the selection or summons of the jurors or formation of the jury must precede the examination of the jurors." However, in extrapolating from some of our early and mid–20th Century opinions, the Court of Appeals cogently noted that a jury selection challenge is not waived if counsel "neither knew nor by the exercise of reasonable diligence could have known of the grounds for challenge before the jury was accepted." *Bartley v. Loyall,* 648 S.W.2d 873, 876 (Ky.App.1982) (discussing cases). We adopt this equitable caveat to RCr 9.34, and turn to the present case to determine whether the caveat is applicable.

---

**2.** Jury orientation and qualification was recorded.

After examining the particular circumstances, we hold that McQueen's failure to challenge the panel prior to examination of the jurors, thus waiving any jury selection issue under RCr 9.34, cannot be saved by the equitable caveat. Through the exercise of reasonable diligence, McQueen's counsel could have discovered the disqualification of Juror S.S. prior to examining the jurors. For instance, McQueen's counsel could have learned of the disqualification by simply walking into the courtroom and observing these non-secretive proceedings. Alternatively, McQueen's counsel could have obtained this disqualification information from Juror S.S.'s qualification form.[3] Thus, McQueen had several available methods to learn of S.S.'s disqualification and cannot claim that he was unable to acquire this information through the exercise of reasonable diligence. As such, we hold that McQueen waived his jury selection argument. RCr 9.34

■ Notwithstanding the waiver, we would not reach a different result if we were to address the merits of McQueen's argument. There is not a shred of evidence in this case that Juror S.S. would have been assigned to McQueen's jury panel, that he or she would have not have been stricken by the parties during voir dire, or that he or she would have actually served on the petit jury. Any argument to the contrary is mere conjecture.

McQueen seems to be suggesting adoption of a sweeping per se rule that treats all selection irregularities as reversible, regardless of how detached any imprecision is from the defendant's case. We reject this approach, and as our recent jurisprudence indicates, require a more tangible correlation between an alleged error and the prejudicial effect to *this* defendant. In *Gabbard,* a case much further down the procedural line than the present one, the trial court's failure to properly strike a juror for cause is non-prejudicial unless the defendant can show that the juror he would have used a peremptory strike on *actually served on the jury. Gabbard v. Commonwealth,* 297 S.W.3d 844, 854 (Ky. 2009).

Furthermore, adoption of a per se rule and its application to this case, as the Commonwealth persuasively notes, would mandate reversal of *every* case decided by this venire, and the quashing of *all* indictments from the grand jury drawn from this venire. Such a result would be catastrophic and would wreak havoc, prospectively, to our justice system.

Finally, before we address McQueen's next point of error, we pause briefly to clarify the effect of a RCr 9.34 waiver. It appears that a couple of our cases suggest that if a challenge to the composition of the panel is first raised on appeal or untimely, we review for "actual prejudice." *Bowling v. Commonwealth,* 942 S.W.2d 293, 304 (Ky.1997); *see also Hall v. Commonwealth,* 2001–SC–0814–MR, 2003 WL 21254856 (May 22, 2003). At the root of the problem appears to be the *Bowling* Court's misunderstanding of some language in *Sanders v. Commonwealth,* 801 S.W.2d 665 (Ky.1990).

■ In *Sanders,* we repeated the basic assertion that our general standard of review for unpreserved error requires a showing of prejudice, *i.e.,* palpable error. *Sanders* does not so much as mention RCr 9.34, and instead deals with voir dire proceedings; thus, it is inapplicable to panel

3. The Administrative Procedures of the Court of Justice require each juror to fill out a qualification form. Part II, Section 7(1). If the juror is disqualified, the judge enters this information on the qualification form. Part II, Section 8(1). And finally, parties and their attorneys have access to these qualification forms. Part II, Section 7(7).

challenges arising during such an early stage of the jury selection process. Permitting a review for "actual prejudice" in the complete absence of any challenge to the selection of the jury panel would render RCr 9.34's waiver effective in name only, as we would then be bound to review the litigant's newly-raised challenge to the panel. *See Stroud v. Commonwealth,* 922 S.W.2d 382 (Ky.1996) (properly applying RCr 9.34's waiver and only addressing the merits in dicta). Therefore, a timely challenge to the panel must be made in accordance with RCr 9.34 or it is waived; we thus overrule *Bowling* and *Hall* to the extent that they conflict with this opinion.

### C. Character Evidence

 McQueen next argues that the trial court deprived him of a fair trial when it overruled his objection and admitted unduly prejudicial character evidence against him. As stated above, Sweeney testified that he visited McQueen's trailer two days before the shooting and observed McQueen order the victim to "get the f—back in" the other part of trailer while she was attempting to get a soft drink out of the refrigerator. Sweeney also testified that McQueen angrily informed him that the victim was stealing from him, and that McQueen had a firearm sitting on the kitchen table. McQueen asserts that this was propensity evidence inferring that because he abused the victim and possessed a gun, he acted in conformity therewith when he shot her. Accordingly, he claims that this testimony ran afoul of KRE 404(b) and did not qualify for any of the KRE 404(b)(1) exceptions. We disagree.

 Our evidentiary rules generally forbid character evidence to prove that the person acted in conformity therewith; however, that evidence is admissible if offered to show "motive ... [or] absence of mistake or accident...." KRE 404(b)(1). We review the trial court's application of that evidentiary rule for an abuse of discretion. *Anderson v. Commonwealth,* 231 S.W.3d 117, 119 (Ky.2007).

As the Commonwealth correctly notes, the singular issue in this case was whether McQueen intentionally shot the victim. That McQueen, two days before he "accidentally" shot the victim in the back of the head, was upset because he believed the victim was stealing from him is proof supporting the inference that the shooting was not a mistake or accident. Furthermore, that evidence could also be considered by the jury as a potential motive for intentionally shooting the victim. Therefore, we conclude that the trial court did not abuse its discretion in admitting Sweeney's testimony regarding McQueen's harsh language and accusations of the theft, as it was offered as evidence of motive or absence of mistake or accident.

Finally, McQueen's argument that the firearm sitting on the kitchen table demonstrated a violent propensity is nonsensical. We fail to see any merit in the argument that the testimony regarding his firearm possession alone, inside his house, demonstrates a violent predisposition that infers he acted in conformity therewith when he shot the victim. Furthermore, KRE 404(b) by its very terms is limited to evidence of "other crimes, wrongs, or acts." Sweeney's testimony that there was a firearm sitting on the kitchen table is not evidence of "other crimes, wrongs, or acts."[4]

---

4. McQueen's attempted parallel to the facts in *Arnett v. Commonwealth,* 470 S.W.2d 834 (1971) is unpersuasive. *Arnett,* a pre-rules case, dealt with "other crimes" evidence stemming from the appellant's "flourishing" a gun at a third party (a violation of the now repealed KRS 435.200).

Consequently, we hold that the trial court did not abuse its discretion when it admitted Sweeney's testimony.

## D. Exclusion of Demeanor Evidence

In McQueen's final argument, he contends that the trial court erred when it excluded evidence of his demeanor following the shooting. During the cross-examination of McQueen's brother, Scott (a witness for the Commonwealth), McQueen's counsel asked, "Well, knowing your brother and watching him that morning, were his actions consistent with an accident?" Scott responded, "Yes." The trial court sustained the Commonwealth's objection and admonished the jury. As a result, McQueen contends that he was denied a right to present a complete defense.[5] We disagree.

KRE 701 permits lay witnesses to testify to opinions based on their perceptions, but they are not permitted to testify regarding another person's state of mind. An exception—the collective facts rule—exists when, based on the witness's own perceptions, the "witness is expressing an opinion about another's mental conditions and emotions as manifested to that witness." *Gabbard v. Commonwealth,* 297 S.W.3d 844, 855 (2009) (internal quotations omitted). However, "[n]o such opinion should be admitted unless it is descriptive of the perceptions of the testifying witness ('short hand renditions')[6] and none should be admitted when the witness can fully describe those perceptions without resort to opinion." Robert G. Lawson, Kentucky Evidence Law Handbook § 6.10[4], at 421 (4th ed.2003). There are a few very limit-

ed "situations in which observations of another's appearances and behaviors could produce a perception about the person's state of mind that would be reliable enough to aid jurors and that could not be communicated by the observer without resort to conclusory language ('she seemed to know the victim')." *Id.* at 420.

In *Gabbard v. Commonwealth,* we addressed an argument nearly identical to that presented by McQueen. Gabbard claimed he accidently shot his girlfriend while cleaning his gun, and sought to have the victim's daughters (who were in another room of the house during the shooting) testify that they told the police the shooting was accidental. Although the daughters observed Gabbard and the victim both before and after the shooting, the witnesses' perception of the shooting itself was limited to hearing the gunshot. As a result, we stated that there was insufficient evidence based on the collective facts for the witnesses to properly testify regarding Gabbard's mental state at the time of the shooting. We held that such testimony was inadmissible without something additional evincing an accident (e.g. hearing Gabbard trip or exclaim in a surprised manner) "because it could not be said that the opinion can be drawn from the perceptions without irrational leaps of logic or that the opinion is one which a normal person would draw on the basis of the observed facts." *Gabbard,* 297 S.W.3d at 856 (internal citations and quotations omitted).

Here, like the daughters in *Gabbard,* Scott was essentially attempting to testify that based on McQueen's demeanor, the

---

5. McQueen gives mere lip service to the constitutional aspects of this argument and focuses on the trial court's evidentiary ruling. From all outward appearances, this is an abuse of discretion argument cloaked in general constitutional terms.

6. This is also known as the collective facts rule or doctrine. *See Gabbard,* 297 S.W.3d at 855.

shooting was an accident. However, compared to *Gabbard*, McQueen has an even weaker argument that Scott had sufficient knowledge of the collective facts necessary to opine regarding McQueen's mental state during the shooting. Scott had absolutely no perception of the shooting or the victim, nor did he observe McQueen before or immediately after the event.[7] Thus, based on his minimal knowledge of the collective facts, Scott's conclusion that McQueen's demeanor indicated he accidentally shot the victim cannot be adduced from his "perceptions without irrational leaps of logic."

Furthermore, we fail to see how a person may accurately perceive the manifestation of emotions suggestive of an accidental shooting. Perhaps McQueen's distraught, shaken up, and suicidal demeanor after the shooting suggests an accident, but it could just as likely imply a range of other emotions, including guilt due to his intentional behavior, sadness about the death, or the feeling of doom with impending arrival of the police. Accordingly, Scott's conclusory testimony regarding McQueen's state of mind during the shooting was not "reliable enough to aid jurors" nor that "which a normal person would draw on the basis of the observed facts." Lawson, Kentucky Evidence Law § 6.10[4], at 420; *Gabbard*, 297 S.W.3d at 856. Finally, we believe Scott's perceptions (McQueen was upset, shaken up, suicidal) can be expressed without "resort to opinion" (the shooting was accidental) regarding McQueen's mental state during the shooting. *See* Lawson, Kentucky Evidence Law § 6.10[4], at 421 (stating a witness's lay opinion of another's mental state should not be admitted when "witness can fully describe [his] perceptions without resort to opinion.").

 As a result of the above analysis, we hold that the trial court did not err when excluding Scott's testimony and again reiterate that a defendant's right to present a defense is not unlimited but subject to the dictates of our well-established evidentiary rules, which are a function of our Legislature's broad constitutional latitude. *U.S. v. Scheffer*, 523 U.S. 303, 309, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998).

### III. *Conclusion*

For the foregoing reasons, we affirm the decision of the trial court.

All sitting. All concur.

---

7. He arrived at his parents' house minutes after the shooting.