RENDERED: JANUARY 31, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-0768-MR

KENYE L. LANGLEY          APPELLANT

v.      APPEAL FROM HENDERSON CIRCUIT COURT
HONORABLE KAREN LYNN WILSON, JUDGE
ACTION NOS. 22-CR-00470 AND 23-CR-00100

COMMONWEALTH OF KENTUCKY          APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CALDWELL, COMBS, AND EASTON, JUDGES.

CALDWELL, JUDGE: After a jury trial, Kenye L. Langley ("Langley") was

convicted by Henderson Circuit Court of first-degree robbery, possession of a

handgun by a convicted felon, intimidating a participant in the legal process, and

two counts of first-degree wanton endangerment. He received a total sentence of

fifteen years' imprisonment. Langley appeals his conviction as a matter of right,

asserting trial errors. We affirm.

## FACTS

Langley was nineteen years old on August 12, 2022, when he was arrested for possession of a handgun by a convicted felon and first-degree wanton endangerment. The Henderson Police Department ("HPD") arrested Langley after an investigation into a shooting. Said shooting had taken place just over two weeks prior and about two miles away from the scene of Langley's arrest.

The afternoon of July 28, 2022, around 3:15 p.m., members of HPD responded to a "shots fired" dispatch at 1424 Woodland Drive in Henderson, the address of Woodsview Apartments ("Woodsview"). Woodsview is an apartment complex consisting of 68 units situated on or near the southern end of Woodland Drive, which ends in a cul-de-sac. The manager of Woodsview would testify that generally, a little less than 200 residents are occupying the apartments at a given time, with at least half of them minor children.

Investigators arriving at the scene found evidence of shots fired into apartment #9. Officers who initially arrived gained access inside from Woodsview management, cleared the apartment, and confirmed no resident there had been home. During their sweep, the officers observed multiple bullet holes to the walls and fixtures inside. One bullet had passed through the walls into an adjoining apartment.

Five shell casings, all from a .380 caliber firearm, were located,

-2-

photographed, and collected outside apartment #9. Three bullet holes visible in apartment #9's windows were photographed. The bullet hole into the adjacent unit was documented and photographed from the stairway of apartment #10, where it had entered. Also found on the same stairway was a projectile HPD determined was a .380 caliber bullet. Officers took statements from witnesses on the scene, including Woodsview employees and residents.

Woodsview's manager, Christine Payne ("Payne"), gave investigating officers access to surveillance video recorded from the front office on Woodland Drive. Payne would later testify that many neighborhood children were out and about that day, at and near the scene, because the shooting occurred midday during the summer. Several children had immediately described to her the shooting and the direction of the car the shots had been fired from. Investigating officers first viewed the video in the front office alongside minors who had witnessed the shooting. These witnesses pointed out a red Chevrolet HHR in the surveillance video as the gunfire's source. Several distinct features of the HHR – including black rims, a black grill, a spoiler, and a small white stripe – were identifiable in the images. Immediate efforts to locate the HHR were unsuccessful.

In the days following, Det. Jake Isonhood, who led HPD's investigation, located an image of a red HHR captured in a video taken by a Flock camera (a license plate recognition system) in Evansville, Indiana. The vehicle

-3-

was recorded traveling southbound in Evansville on July 28, 2022, at 11:45 a.m., roughly three-and-a-half hours prior to the shooting. Details and features of the vehicle matched those of the HHR in the Woodsview surveillance video. Retrieving license plate information, Det. Isonhood found the HHR was registered to Devin Druin ("Druin") in Evansville.

On August 5, 2002, after tracking Druin down, Det. Isonhood accompanied another officer to Druin's attorney's office where Druin's recorded statement was taken. At that time, Druin identified Langley as the shooter in the incident. He also alleged Langley had stolen his wallet just after the shooting and had threatened him with retaliation if Druin broke his silence.

Druin told investigating officers he saw the handgun Langley used and believed it was a .380 caliber. After his recorded statement, Druin provided HPD with a pencil drawing depicting his recollection of Langley's handgun. Additionally, Druin provided an account statement showing declined charges from a company called Jp Taxi. The card associated with this account had been in Druin's wallet when Langley took it, the charges had been attempted after the shooting, and Druin had not authorized them, according to Druin.

Even prior to Druin's recorded statement, Detective Isonhood had received a tip from another source identifying the shooter as Langley. This led him to obtain and view a video from the Henderson County Detention Center

-4-

("HCDC") recorded July 27, 2022, the day prior to the shooting. Depicted therein was a "visit" Langley made to an HCDC inmate, by videoconference, with Langley calling from a remote location. The jail call video showed a split screen with the HCDC inmate's face and torso on the left side on the screen and Langley on the right. Langley's hair is styled in a tall Afro in the video. On multiple occasions during the video call, Langley moved the camera he was using from his own face and pointed it toward different parts of the room he was in. For a couple of moments, during these points, what appears to be a handgun on top of a piece of furniture comes into Langley's camera's view.

The jail video call begins with Langley and the inmate exchanging greetings, after which the inmate asks, "where you at?" and Langley responds, "I'm at my spot . . . my crib." After this, the inmate asks Langley for a "house tour" and Langley briefly moves his camera to pan around the room. At one point, the inmate asks Langley who the person in the room with him is and Langley responds, "that's my girl." At the inmate's request, Langley points the camera toward a bed beside him and a young woman can briefly be seen.

After he was located and arrested by HPD, Langley was eventually indicted for first-degree robbery, possession of a handgun by a felon, first-degree wanton endangerment, and intimidating a participant in a legal process.

A trial took place on May 25, 2023, in a bifurcated guilt-phase proceeding; the jury was not asked to consider the felon in possession of a handgun charges initially. The errors alleged by Langley as the basis for his appeal occurred during the initial guilt phase. Langley did not testify, and the defense put on no proof after the Commonwealth rested. The Commonwealth called numerous witnesses including employees of Woodsview and several officers from HPD who responded to the dispatch.

***Trial Testimony of Woodsview Residents***

Adam Clark ("Clark"), who lived in apartment #10, described how he and his wife Marion were at home napping when they were awakened by the gunfire. Clark said he had found the bullet hole in his stairway through a wall adjacent to apartment #9 just after he awoke to the gunfire. Although Clark and his wife were home alone at the time, Clark said their young son often played on the stairway when the couple's children were home.

Two young men who resided in Woodsview, Eric Ponder and S.M.,[1] testified. Both had given statements to HPD on the day of the shooting. Neither saw the shots being fired, both heard the shots, then observed a red SUV-type vehicle fleeing. Both saw a white male in the driver's seat and a black male in the passenger seat. Ponder, who was walking back to Woodsview after playing

---

[1] Names of witnesses who were minors at the time of the trial are indicated by initials.

-6-

basketball when he heard the shots, described seeing a "silverish" gun held by the black male. On cross-examination, he described his line of vision on the gun as being through the vehicle's windshield. S.M. described running from his apartment after hearing the shots and seeing the red SUV. He described being able to see that the black male was holding a "small silver pistol." S.M. said the black male was wearing a hoodie and described his hair as "an Afro."

***Trial Testimony of Det. Jake Isonhood***

Det. Isonhood was the final member of HPD to testify during the initial guilt phase. He described the investigation and his own efforts to locate the red HHR, and then Druin. The recorded statement Druin gave was briefly discussed. At that point in the investigation, Det. Isonhood believed Langley's jail call video had been made from a house at 131 Clay Street in Henderson, and he took a photo of the house to Druin's recorded statement. Det. Isonhood described the investigation, including his taking a statement from Melissa Easley, who resided at 131 Clay Street, on August 15, 2022. Additionally, he took statements at Henderson County schools, on August 24th and 25th of 2022 from H.N.[2] and M.E., both minors who resided at 131 Clay Street. In response to an inquiry about

---

[2] H.N. was named as a witness by the Commonwealth and was even mentioned in opening statements. However, for reasons which do not appear in the record before us, she did not testify.

H.N., Det. Isonhood stated she was the person in the room with Langley on the jail call video.

The detective went on to describe his questioning Langley on August 12, 2022. He began with asking Langley where he was currently staying and Langley asserted he had no fixed address. Det. Isonhood asked Langley if he had ever hung around at 131 Clay Street or known anyone there and he described Langley saying he "promised" he had not. After Det. Isonhood showed him a photograph of the house, Langley admitted to having been there but not within a couple of months. After being confronted with further information about Easley, Langley admitted he had stayed there but had already moved out before the time of the shooting.

Det. Isonhood described showing Langley a photo of Druin's HHR from the Flock video and telling him the vehicle's owner identified him as the shooter. Langley told him he "did not shoot a gun." At that point, Det. Isonhood said he "brought up the jail video visit" and described to Langley that when his "camera pans – there is a gun there." Det. Isonhood said Langley told him he didn't have a gun, so he "went over the visit again" and said to Langley "you're standing here and there's a door behind you and a closet behind you and there's a bed right here. You pan and there's a gun. And [Langley's] response was, well that's not mine though." As he described pressing Langley further, Det. Isonhood

said he "did not deny existence" of a gun in the room with him, he "just denied ownership."

### Trial Testimony of Devin Druin

Druin was twenty years old when he testified at Langley's trial. On July 28, 2022, Druin had driven from Evansville to 131 Clay Street in Henderson, planning to smoke marijuana with a female acquaintance. After arriving there, Druin was introduced to Langley, who told him he was "cousins with" Druin's older brother. Druin testified this prompted him to phone his older brother, who confirmed Langley was his cousin. Following this, the pair, along with several females, smoked marijuana and talked for a period. Eventually, Langley told Druin he wanted to go to see his daughter and asked for a ride to do this. Druin, despite having only just met Langley, thought he "seemed like a nice person" and so he agreed. Following Langley's directions, he drove until they arrived at Woodsview, where he circled two or three times at Langley's request, before being directed to stop.

As he came to a stop, Druin recalled, his sight was focused upon "kids in the middle of the road." Immediately upon reaching a full stop, he heard gunfire and believed they were being shot at, which caused him to speed off in a panic. While making his first turn onto the "main road," Druin explained, he looked over

to see that Langley was okay. At that time, he saw Langley had a gun in his right hand.

Druin testified smoke was still coming from the barrel when he first laid eyes on the gun. Druin said he was familiar with guns and believed the gun he saw in Langley's hand was a .380. He said he only saw the top of the gun and it was "silver," later describing it as having a "silver slide." In the drawing Druin provided, he had drawn grooves at the top of the gun.

Upon seeing the gun, Druin yelled, "what the f--- bro!?!" to which Langley commanded he "shut up and keep driving." Druin complied and drove Langley to a directed location. As Druin stopped for Langley to get out, Langley displayed Druin's wallet he had taken from an open center compartment, saying to Druin, "if you tell anybody, I know where you live." Druin affirmed on redirect he had felt intimidated by Langley at this time.

After he left Langley, Druin immediately called his father, who told him to go home. Druin said he did not call the police because of fear for his younger sister. Asked to explain, Druin said he did not live at the address which would be found in his wallet; that address referred to his mother's house, where his sister lived. He did not want "to put her in harm's way." When asked to explain this further, Druin alluded to his own older brother associating with a group he avoided as they were violent.

-10-

For the next few days, Druin tried to put the incident out of his mind and act as though nothing happened. This came to an end when he received a message from his father that his vehicle had "been on the news" in connection with a shooting. Druin, along with his mother, took steps to contact HPD and arranged to give an interview. This was soon rescheduled to a short time later, after his consulting with an attorney.

### Testimony of Melissa Easley

Melissa Easley was the final witness to testify in the initial guilt phase. Easley testified she knew Langley as a friend of her kids who was staying in her home, on 131 Clay Street, in July 2022. Easley had let Langley move in because he "needed a place to go." She "threw him out" after finding him "in bed with a sixteen-year-old girl" and deciding he was "too friendly with the kids." Easley's daughter, M.E., and H.N. were both living with her at this time. Easley's boyfriend, Stevie Davis, was also living there. Davis, Easley confirmed, was employed by Jp Taxi in July of 2022.

Asked about Druin, Easley described an occasion she encountered him in her home and "kicked him out." She described "throwing out" both Druin and Langley at this time. Upon careful review of her testimony, Easley appears to describe this as part of the same event for which she evicted Langley. Both parties seemed to question Easley under an initial presumption that the encounter she

-11-

described occurred the same day as the shooting. However, Easley indicated she knew nothing of the shooting at the time and could not say this encounter occurred the same day. Easley did recall her encounter with Druin occurred upon her arrival home from work.

On cross-examination, Easley said she had worked different shifts during this period but believed her shift, on the day she encountered Druin, would have put her arrival home sometime between 6 and 7 p.m. Immediately afterward, she agreed to the defense's estimate of 4 to 6 p.m. On redirect, she conceded she may have been working a different shift altogether and could have arrived home significantly earlier in the day (and prior to the time of the shooting). Near the close of her testimony, Easley made clear she could not commit to her encounter with Druin even taking place the same date as the Woodsview shooting. She put it close in time but said it could have well been another day entirely.

Easley said she found a wallet in her basement that she knew was Druin's because his I.D. was in it. Easley's daughter and boyfriend both made calls to Druin in efforts to get his wallet back to him, she said, but Druin never came to retrieve it. Easley was unsure about the length of time after her encounter with Druin before she found his wallet. She described it being "right after" at one point and "maybe a day or two" later, at another.

Shown a still image from the jail video call, Easley confirmed the room Langley was in looked like an upstairs bedroom of 131 Clay Street. Examining another still image from the jail video call, with the person in the bed beside Langley visible, Easley testified it "could be my daughter or maybe [H.N.]."

In closing arguments, Langley, by counsel, argued the shooter was, in fact, Druin. Easley's testimony established Druin had returned to 131 Clay Street after the shooting and demonstrated no fear of Langley. Furthermore, Langley argued, Easley's account showed Langley had not taken Druin's wallet; Druin simply left it behind. He argued the testimony of Eric Ponder, who said he could see the gun through the HHR's windshield, was more consistent with the gun having been in Druin's hand, rather than in Langley's. The "gun" seen near Langley in the jail video call, he argued, could as well have been an air pistol. Langley asserted the gun in the video appeared smooth on top, was not shiny, and was darker in color than witness descriptions of the gun used in the Woodsview shooting.

Despite Langley's arguments, the jury found him guilty of first-degree robbery, first-degree wanton endangerment (two counts), intimidating a participant in the legal process, and possession of a handgun by a convicted felon. The jury recommended a total sentence of fifteen (15) years in prison, and the trial court sentenced Langley consistently with this recommendation. Langley appeals from

-13-

his conviction and sentence.  Further facts will be developed as necessary.

## ANALYSIS

We begin our review on the instances of preserved error, first with the denial of Langley's motion for a directed verdict.

### I.  Directed Verdict

At the close of the Commonwealth's proof, defense made a motion for a directed verdict of acquittal on the charge of first-degree robbery.  Langley alleges the trial court's denial of this motion was reversible error.

For our standard of review, "the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991).

KRS[3] 515.020(1) defines the elements of first-degree robbery:

> A person is guilty of robbery in the first degree when, in the course of committing theft, he or she uses or threatens the immediate use of physical force upon another person with intent to accomplish the theft and when he or she:
>
> (a) Causes physical injury to any person who is not a participant in the crime; or
>
> (b) Is armed with a deadly weapon; or

---

[3] Kentucky Revised Statutes.

(c) Uses or threatens the immediate use of a dangerous instrument upon any person who is not a participant in the crime.

The trial court's instruction on the first-degree robbery charge required the jury to find:

A. That in this county on or about July 28, 2022, [Langley] stole a wallet from Devin Druin,

B. That in the course of so doing and with intent to accomplish the theft, he used or threatened the immediate use of physical force upon Devin Druin;

C. That when he did so he was armed with a gun

And

D. That the gun was a deadly weapon[.]

Langley argues there was insufficient evidence to support the jury's finding of guilt. In particular, he argues the Commonwealth failed to prove he threatened the immediate use of physical force upon Druin to accomplish the theft of his wallet.

Langley points out Druin's testimony was the substantive basis of the first-degree robbery charge. Per Druin's allegations, Langley did not point the gun at him when he took his wallet. Druin conceded Langley made no specific references to having a gun. Furthermore, Druin conceded Langley made no explicit threat of *immediate* harm when taking the wallet, only saying, "if you tell anyone, I know where you live."

-15-

Robbery in the first degree, as defined in KRS 515.020(1), is an aggravated form of robbery, containing all of the elements of robbery in the second degree,[4] with the addition of one of three possible aggravating factors. The jury in Langley's trial was instructed under KRS 515.020(1)(b), requiring a finding only that Langley was armed with a deadly weapon, during a theft, which he accomplished by threat of immediate physical force. The Commonwealth was not required to prove that Langley threatened Druin with the handgun in his possession, but only that Langley threatened the use of immediate physical force.

Langley acknowledges the statement Druin described that "if you tell anybody, I know where you live" might be reasonably interpreted by the jury as "a veiled, conditional, *future* threat of some harm if Druin told anyone about the incident." (Emphasis added.) Langley argues this threat of future harm was the only one in evidence and it was insufficient for the jury to find a threat of *immediate* physical force.

Such an argument implies Druin's testimony described, at most, a theft accomplished solely by a threat of physical force in the future – extortion rather than robbery. However, the Commonwealth argued at trial it was unnecessary for Langley to brandish the firearm, or explicitly reference it, to

_____

[4] KRS 515.030(1) defines robbery in the second degree: "A person is guilty of robbery in the second degree when, in the course of committing theft, he or she uses or threatens the immediate use of physical force upon another person with intent to accomplish the theft."

establish he used a threat of force to accomplish the theft. Evidence supported a finding that Langley's threat of *immediate* physical force was conveyed implicitly, rather than explicitly voiced. Druin's testimony indicated he knew Langley was in possession of a firearm that, very shortly beforehand, he had fired into an apartment in a densely populated area, and that Druin had felt intimidated by Langley when Langley took Druin's wallet.

Confronted with a motion for directed verdict, the trial court must assume the truth of the Commonwealth's evidence and "draw all fair and reasonable inferences from the evidence in favor of the Commonwealth." *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991). Questions regarding the weight of the evidence and credibility of witnesses are reserved for the jury. *Id.*

Langley requested, and received, an instruction on a lesser charge of theft by unlawful taking. The jury, however, was apparently not convinced that the Commonwealth failed to prove the element of a threat of immediate physical force. "To sustain a conviction for robbery, all of the elements of theft or attempted theft must be proved plus the additional element that in the course of committing theft the use or the threat of immediate use of physical force upon another person with intent to accomplish the theft." *Morgan v. Commonwealth*, 730 S.W.2d 935, 937 (Ky. 1987).

The threat of physical force need not be explicit; a threat of physical force which is implied from a defendant's conduct may be sufficient for a robbery conviction. *Lewis v. Commonwealth*, 399 S.W.3d 795, 797 (Ky. App. 2013) (citing *Tunstull v. Commonwealth*, 337 S.W.3d 576 (Ky. 2011); *Birdsong v. Commonwealth*, 347 S.W.3d 47 (Ky. 2011)).[5] The firing of a handgun, multiple times toward a densely populated area, then commanding to be driven to a directed location, just before brazenly taking another individual's wallet, is implicitly threatening behavior, in and of itself. *See Tunstull*, 337 S.W.3d at 583 (citing *Lawless v. Commonwealth*, 323 S.W.3d 676 (Ky. 2010)). Druin testified to obeying Langley's commands from the shooting throughout the remainder of his encounter with him and said, "he had a gun, and I didn't, so there wasn't much I could do." He affirmed he had felt intimidated at the time Druin took his wallet. A reasonable juror could certainly have found from Druin's testimony describing Langley's behavior, an implicit and immediate threat that physical force would have followed if Druin had resisted Langley's taking Druin's wallet.

Langley's brief emphasizes conflicts between Druin's and Easley's testimony. It is true that, in several aspects, their accounts were at odds. However, the jury's determinations of weight and credibility in this regard are beyond the

---

[5] *Lewis* concerned a directed verdict denial on second-degree robbery but on the same element of robbery as at issue here.

scope of our review. *See Beaumont v. Commonwealth*, 295 S.W.3d 60, 67 (Ky. 2009). We discern no reversible error in the trial court's denial of Langley's motion for a directed verdict for first-degree robbery under the applicable standard of review. The jury's finding of guilt was not unreasonable given the evidence as a whole. *See Benham*, 816 S.W.2d at 187. We affirm the trial court's denial of directed verdict on this count.

## II.    KRE[6] 404

Moving to the other preserved allegation of error, Langley alleges the trial court erred in denying his motion to exclude the jail call video. When reviewing a trial court's evidentiary rulings, our standard of review is abuse of discretion. "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

The Commonwealth filed formal notices of its intention to introduce evidence of other crimes, wrongs, or acts pursuant to KRE 404(c) and argued the video would be presented as proof of the opportunity to possess the handgun in the video. A supplemental notice indicated Druin would testify about the description of a handgun consistent with that depicted in the jail call video. The Commonwealth argued the video's introduction would be for corroboration of

---

[6] Kentucky Rules of Evidence.

Druin's testimony, rather than Langley's propensity to violence. Langley filed no written responses. During a pretrial conference, the court heard argument from both parties. The trial court reserved its ruling until the morning of trial, when the court ordered the jail video call could be admitted. Langley renewed his objection on the record.

At trial, the video was initially introduced during the testimony of Major William Payne of HCDC, who authenticated it being an HCDC video call taking place July 27, 2022, shortly after 6:00 p.m. Major Payne verified the inmate depicted was incarcerated at HCDC on that date. About a minute and a half of the jail video call was played. Later, the video was played during the testimony of Detective Isonhood.

KRE 404(b) dictates that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Such evidence may be admissible when it is "offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]" KRE 404(b)(1). Such evidence may also be admissible where it is "so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party." KRE

404(b)(2).  KRE 404(b) is exclusionary in nature.  *Bell v. Commonwealth*, 875 S.W.2d 882, 889 (Ky. 1994).

To determine whether 404(b) evidence is admissible, a trial court is to use a three-prong test:  "(1) Is the evidence relevant?  (2) Does it have probative value?  (3) Is its probative value substantially outweighed by its prejudicial effect?"  *Leach v. Commonwealth*, 571 S.W.3d 550, 554 (Ky. 2019) (citing *Purcell v. Commonwealth*, 149 S.W.3d 382, 399-400 (Ky. 2004), *overruled on other grounds by Commonwealth v. Prater*, 324 S.W.3d 393, 399-400 (Ky. 2010)).

"The first prong of the test is whether the proffered evidence is relevant for a purpose other than criminal disposition."  *Leach*, 571 S.W.3d at 554.  Acceptable purposes of other bad act evidence include "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]"  KRE 404(b)(1).  The statutory list is not exhaustive but illustrative.  *Tamme v. Commonwealth*, 973 S.W.2d 13, 29 (Ky. 1998).  The evidence must be offered to prove material facts which are actually disputed. *Leach*, 571 S.W.3d at 554.

For the second prong, "the trial court must determine if the evidence of the uncharged crime is sufficiently probative of its commission by the accused to warrant its introduction into evidence."  *Id*.  This standard is met if the trial

judge believes "the jury could reasonably infer that the prior bad acts occurred and that [the defendant] committed such acts." *Parker v. Commonwealth*, 952 S.W.2d 209, 214 (Ky. 1997).

For the third prong, "the trial court must weigh the prejudicial nature of the 'other bad acts' evidence versus its probative value. Only if the potential for undue prejudice substantially outweighs the probative value of the evidence must it be excluded." *Leach*, 571 S.W.3d at 554.

Langley argues no connection between the item in the video and the gun used in the offenses was established; nothing tied the "gun" in the video to the gun used in the crime. Accordingly, he argues, the evidence was not relevant and could not serve the purpose of proving Langley's opportunity to access a gun.

The Commonwealth argued to the trial court that the firearm pictured in the video call resembled the firearm described and drawn by Druin, and that the jail call video was recorded less than 24 hours before the shooting. HPD was unable to locate the firearm used in the shooting and the video was substantive evidence that Langley had access to a handgun and the opportunity to possess one the day prior to the shooting. The jail call video depicted Langley's appearance, less than 24 hours before the shooting, and showed he was at 131 Clay Street. It provided context of the HPD investigation, corroborated testimony regarding

where Langley resided at the time, and established his having access to the house where Druin's wallet was later found.

Langley insists the evidence of the gun was not probative for the same reasons as he argued it was not relevant, that no connection was made between the gun in the video and the gun used in the crime. However, Druin testified the handgun had a "silver slide," the eyewitnesses to Druin and Langley fleeing described the gun as "silverish" and a "small silver pistol." The Commonwealth argued the gun shown on the video resembled these descriptions and Druin's drawing. Langley's arguments about the gun's appearance greatly differing from Druin's description and drawing were presented to the jury.

Having viewed the jail video call, we conclude a jury *could* reasonably infer the handgun in the video matched the descriptions of the gun used in the shooting and that the video demonstrated Langley's access to it. It is clear the evidence was sufficiently probative to warrant its introduction into evidence under standards discussed in *Leach*, 571 S.W.3d at 554.

Finally, this evidence was not unduly prejudicial, and its potential for prejudice did not substantially outweigh its probative value. Evidence is only unduly prejudicial if it "produces an emotional response that inflames the passions of the triers of fact or is used for an improper purpose." *Id*. (citation omitted). No such prejudice arises from the mere possession of a firearm, which by itself is not

-23-

a crime or proof of a violent character. *McQueen v. Commonwealth*, 339 S.W.3d 441, 448 (Ky. 2011).

The trial court did not issue any findings as to why it allowed introduction of the jail video call, but there was a legally sufficient basis for it to allow introduction of the video based on applicable law and the record before us. There is no indication the trial court's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles. In sum, the trial court did not abuse its discretion in allowing the jail call video into evidence despite Langley's KRE 404(b) argument.

## III. Unpreserved Errors

Langley makes two arguments regarding the jail call video which were not specifically preserved. One concerns the audio portion of the recording and the other concerns Det. Isonhood's testimony.

For errors not preserved for our review, the standard of review is the same: only when manifest injustice occurs may palpable error be found, and an unpreserved error reversed.

> For an error to be palpable, it must be easily perceptible, plain, obvious and readily noticeable.
>
> A palpable error must involve prejudice more egregious than that occurring in reversible error. A palpable error must be so grave in nature that if it were uncorrected, it would seriously affect the fairness of the proceedings.

-24-

> Thus, what a palpable error analysis boils down to is whether the reviewing court believes there is a substantial possibility that the result in the case would have been different without the error. If not, the error cannot be palpable.

*Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006) (internal quotation marks and citations omitted).

1. *Audio on the Jail Call*

Langley argues the trial court should have removed the audio from the jail call video because the audio was unduly prejudicial. Langley points only to a specific portion of the audio about someone having "f---ed up." Langley argues the jury may have interpreted this statement as relevant to Langley's actions the following day. Langley did not specifically object to the video's audio or request at any point that the audio be removed when the video was played.

Upon careful review of the jail video call, as played before the jury during Det. Isonhood's and Major Payne's testimony, and with the convenience of being able to play it multiple times, it is quite difficult to identify the portion of the audio to which Langley refers. The aforementioned words seem to have occurred during a portion of the audio that is nearly inaudible. Neither the Commonwealth nor any witness appears to have referred to this nearly inaudible portion of the videorecording.

-25-

The audio was relevant; statements made by Langley during the conversation corroborated testimony concerning Langley's living arrangements, as well as his relationship with minors at 131 Clay Street. The probative value of the audio outweighed any prejudice to Druin, particularly since it is doubtful the jury could even hear the allegedly prejudicial statement about someone having f—ed up.

We certainly do not detect any error so palpable and so fundamental that it threatened the integrity of the judicial process in the trial court allowing the video to play with audio. *See Brewer*, 206 S.W.3d at 349; *Martin v. Commonwealth*, 207 S.W.3d 1, 5 (Ky. 2006).

2. *Testimony of Det. Isonhood*

Next, Langley argues Det. Isonhood "interpreted" the video and was not testifying from personal knowledge and thereby usurped the function of the jury as the ultimate finder of fact. *See Gordon v. Commonwealth*, 916 S.W.2d 176, 179-80 (Ky. 1995). The Commonwealth argues Det. Isonhood's initial testimony was not interpretive, in the sense that it was responsive to the Commonwealth's questions, requesting he describe the steps of his investigation. *See Cuzick v. Commonwealth*, 276 S.W.3d 260, 266 (Ky. 2009) ("Narrative testimony is not necessarily interpretive testimony[.]"). Any testimony which was interpretive, the Commonwealth argues, was solicited by the defense during cross-examination and

the errors, if any, were invited. *Robertson v. Commonwealth*, 677 S.W.3d 309, 318 (Ky. 2023) (citations omitted) ("A party is estopped from asserting an invited error on appeal.").

No objection regarding Det. Isonhood's testimony about the video occurred at trial. The primary "interpretation" Langley identifies having occurred in Det. Isonhood's testimony is that concerning the gun seen in the video and its characteristics. Most of Det. Isonhood's testimony regarding the jail video call did occur during cross-examination.

About a minute and a half of the video was played in front of the jury, without interruption, near the end of Det. Isonhood's direct examination. After the video played, the Commonwealth asked him whether the video was the same one he'd referred to in his testimony and he affirmed it was. Prior to the playing of the video, Det. Isonhood had described confronting Langley during questioning on August 15, 2022, and telling Langley a gun could be observed in the room during the jail call video.

The only significant descriptions of the video's contents by Det. Isonhood during direct examination occurred during his recollections of describing the video to Langley. These were his accounts of telling Langley that after his "camera pans – there is a gun there" and that "you're standing here and there's a

door behind you and a closet behind you and there's a bed right here. You pan and there's a gun."

On cross-examination, defense counsel initially questioned Det. Isonhood about a still shot from the video, showing the handgun. This included a series of questions regarding his opinion on the handgun and whether it matched witness descriptions of the gun in the shooting. Det. Isonhood testified the gun appeared silver to him but conceded it might be fairly described as dark silver or grey, at the particular camera angle and lighting. Following this, defense counsel played a portion of the video which had been slowed down, then continued to ask Det. Isonhood for opinions on the appearance of the gun in the video. This included a line of questioning on whether the gun in the video appeared "smooth" at the top or whether grooves consistent with those drawn by Druin could be seen. Det. Isonhood testified the top was difficult to see well enough to judge. He conceded that not all of the gun's barrel could be seen at any point past the trigger guard. He conceded he could not say with any certainty that the gun in the video was not an air pistol but repeated that Langley had never asserted to him that the gun in the video was an air pistol and had only denied ownership.

Generally, the testimony of a lay witness is limited to matters or facts about which he has personal knowledge. *See* KRE 602; KRE 701; *Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276, 287 (Ky. 2014); *Martin v. Commonwealth*, 13

-28-

S.W.3d 232, 235 (Ky. 1999). During Det. Isonhood's direct examination testimony on this subject, no objections occurred. Det. Isonhood appeared careful when testimony turned to the subject of the jail call video and hesitant to express opinions about its contents. Within the narrative of his questioning Langley, Det. Isonhood did not describe anything that was not captured in the video recording itself, which the jurors were able to watch and interpret independently. *Boyd v. Commonwealth*, 439 S.W.3d 126, 132 (Ky. 2014). If any error occurred during Det. Isonhood's direct examination, it was certainly not palpable and so fundamental that it threatened the integrity of the judicial process. *See Brewer*, 206 S.W.3d at 349; *Martin*, 207 S.W.3d at 5.

The majority of Det. Isonhood's testimony regarding the contents of the jail video call did occur on cross-examination. Det. Isonhood had expressed no opinions on whether the gun in the video was consistent with witness descriptions of the gun used in the shooting incident until he was cross-examined. Up to that point, the only references to the gun in the jail call video occurred within statements he recalled making to Langley. No opinions regarding the gun in the video's likely caliber or its appearances had been expressed prior to defense counsel's cross-examination of Det. Isonhood. "A party is estopped from asserting an invited error on appeal." *Robertson v. Commonwealth*, 677 S.W.3d 309, 318 (Ky. 2023) (citations omitted).

## CONCLUSION

Having reviewed the briefs of the parties and the rulings of the trial court along with the record and applicable law, no error occurred during the trial which would require reversal of Langley's conviction or sentence. The Henderson Circuit Court is affirmed.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Sarah D. Daily
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

Brystin Denguessi Kwin
Assistant Attorney General
Frankfort, Kentucky